FILED

2006 Mar-02  AM 10:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| QORE PROPERTY SCIENCES, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No.  CV-03-S-2755-NE |
| | ) | |
| CIVIL SOLUTIONS, INC.; CIVIL SOLUTIONS, LLP; WILLIAM KENNARD; DIANA LACK; BRIAN COOK; RICHARD GRACE; JEFF MULLINS; GEO SOLUTIONS, LLC; GRACE GROUP, P.C.; JEFF W. MULLINS, P.C.; W. KENNARD, INC.; BRIAN COOK, INC.; | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

QORE Property Sciences, Inc. ("QORE"), a Georgia corporation, brings this action for equitable relief and money damages against twelve defendants, all of whom are Alabama citizens.  Among the defendants are Bill Kennard, Diana Lack, and Brian Cook, who formerly were QORE employees, but who are now part of a business venture in competition with their former employer.

QORE asserts state-law claims of conversion (Count I), violations of the Alabama Trade Secrets Act (Count II), breach of fiduciary duties (Count III), tortious

interference with contractual and business relations (Count IV), fraudulent suppression of material facts (Count V), and conspiracy (Count VI). QORE also seeks to pierce the veils of a number of professional corporations and a limited liability company ("LLC") named as defendants in this action, so as to hold the individual stockholders and LLC members directly liable for their alleged torts (Count VII).[1]  In turn, defendants Cook, Kennard, and Lack assert counterclaims alleging violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* (Count I), violations of the right to privacy under Alabama law (Count II), and tortious interference with business relations (Count III).[2]

The court has original jurisdiction over the claims asserted in QORE's complaint, twice amended, on the basis of the amount in controversy and complete diversity of citizenship. *See* 28 U.S.C. § 1332(a)(1). Count I of the defendants' counterclaims arises under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* and, therefore, jurisdiction over those claims is based upon a federal question. *See* 28 U.S.C. § 1331. It is undisputed that the court may exercise supplemental jurisdiction over the remaining counterclaims, which arise under state law. *See* 28 U.S.C. § 1367.

---

[1] *See* doc. no. 76 (Second Amended Complaint).

[2] *See* doc. nos. 52-54 (answers and counterclaims).

This action now is before the court on defendants' motions for summary judgment on all claims asserted by QORE.[3]  Additionally, the action is before the court on QORE's motion for summary judgment on the counterclaims asserted by defendants Brian Cook and Bill Kennard.[4]

Where, as here, jurisdiction is founded on diversity of citizenship, the court must apply state substantive law and federal procedural and evidentiary rules.  *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-45 (11th Cir. 1982); *Johnson v. William C. Ellis & Sons Works, Inc.*, 609 F.2d 820 (5th Cir. 1980).

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time

---

[3] Doc. no. 138 (motion for summary judgment filed by Diana Lack); doc. no. 140 (motion for summary judgment filed by remaining defendants, who call themselves the "Geo Solutions" defendants).

[4] Doc. no. 133.  QORE did not move for summary judgment on the counterclaims asserted by Diana Lack.

for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## I. FACTUAL BACKGROUND

QORE is an engineering company whose 500 or so employees serve clients in the Southeastern United States through a network of over 25 major offices in eight or nine states.[5] QORE provides engineering services including, but not limited to,

---

[5] *See* doc. no. 163 (Plaintiff's Evidentiary Submission in Response to Defendants' Motion for Summary Judgment), Vol. III, Ex. 24, Deposition of Dirk Van Reenan, at 25; doc. no. 180 (defendants' supplemental evidentiary exhibits), Ex. E, Statement of Qualifications, at section titled "Information on QORE, Inc." *See also* description of company, *available at* http://www.qore.net.
    Parties were required to file all evidentiary materials using an electronic document filing

construction materials testing and geotechnical engineering.  In simplified terms, construction materials testing involves analysis of construction materials such as concrete, masonry, asphalt, and steel.[6]  Geotechnical engineering involves, among many other duties, evaluation of site preparations and geologic reconnaissance.[7]

QORE's corporate structure is organized into six regions, including the Northwest region, which has branch offices located in Tennessee, Kentucky, and importantly, Huntsville, Alabama.[8]  The Huntsville office is itself divided into several departments, including geotechnical services and construction materials testing.

## A.    QORE's Corporate Hierarchy

During the period relevant to this lawsuit, Dirk Van Reenan was the President

---

system.  However, the electronic system is apparently limited in how many pages of material it can process at any one time.  Therefore, plaintiff's evidentiary materials were separated and filed as documents 163 through 168, even though as a "hard copy," the materials were organized into three volumes with 25 exhibits.  For the sake of simplicity and consistency, the court will generally cite plaintiff's evidentiary materials as "doc. no. 163," and provide a more specific citation in the manner organized by plaintiff — *i.e.*, by volume number, exhibit number, and page number.

[6] Doc. no. 180 (defendants' supplemental evidentiary exhibits), Ex. E, Statement of Qualifications, at sections titled "Scope of Services" and "Information on QORE, Inc."

[7] *See id.*

[8] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 9, Deposition of Mack McCarley, vol. 1, at 184-85, 282; *id.*, Vol. III, Ex. 13, Affidavit of Mack McCarley, ¶ 2 at 1 (testimony that McCarley is Regional Manager of "Northwest" region).

There is some evidence that the region encompassing the office located in Huntsville, Alabama may be called the "Northern" region, instead of "Northwest."  *See id.*, Vol. III. Ex. 24, Deposition of Dirk Van Reenan, at 30 (testifying that Mack McCarley is Regional Manager of "Northern" region).

of QORE,[9] Mack McCarley was Regional Manager of the Northwest Region,[10] and defendant Brian Cook was Branch Manager of the Huntsville office.  Cook's duties as Branch Manager were two-fold:  he supervised all employees of the Huntsville office (numbering approximately forty individuals);[11] and, he managed the day-to-day operations of the office's construction materials testing department.[12]  There also is evidence that Cook was "a vice president of the company,"[13] although the record does not specify all responsibilities that accompanied that title.

Defendant Bill Kennard was a licensed Professional Engineer, and he worked under Cook's supervision at the Huntsville office.  Kennard held the position of Senior Geotechnical Engineer, and in that capacity, he was head of the office's geotechnical department.[14]  Kennard also was charged with the responsibility of supervising defendant Diana Lack.  She had expertise in both geotechnical services and construction material testing, and she also was a licensed Professional Engineer.[15]

---

[9] *See id.*, Vol. III. Ex. 24, Deposition of Dirk Van Reenan, at 17.

[10] *See id.*, Vol. II, Ex. 9, Deposition of Mack McCarley, vol. 1, at 13; *id.*, Vol. III, Ex. 13, Affidavit of Mack McCarley, ¶ 2 at 1.

[11] *See id.*, Vol. II, Ex. 8, Deposition of Jan Gill Wilkinson, at 54.

[12] *See id.*, Vol. I, Ex. 2, Cook deposition, 27, 30; *id.*, Vol. I, Ex. 1, Deposition of Charles Oligee, at 19.

[13] *See id.*, Vol. I, Ex. 1, Oligee deposition, at 147.

[14] *Id.*, Vol. I, Ex. 3, Deposition of William T. Kennard, vol. 1 at 14-16; *id.*, Vol. III, Ex. 12, Deposition of Edward Heustess, vol. 1, at 172.

[15] *See id.*, Vol. I, Ex. 4, Deposition of Diana Lack, at 12-14.

The Huntsville office employed a number of administrative personnel, including Jan Gill Wilkinson, Mary Hall, April St. John, and Whitney Cox. Wilkinson was Branch Administrator, and her duties included paying the office's bills, keeping track of employee personnel files, and completing payroll.[16] Mary Hall worked in the geotechnical department, answering telephones and typing reports and proposals for Bill Kennard.[17]   April St. John was assigned to the construction materials testing department, where she primarily assisted Brian Cook.[18]   Whitney Cox also assisted Brian Cook.[19]

## B.   Civil Solutions, LLP

Defendant Civil Solutions, LLP is a civil engineering firm with offices located in Huntsville and Decatur, Alabama.  It was founded in 1999 by defendants Jeff Mullins and Richard Grace, who owned and operated the limited liability partnership through corporate entities established for that purpose, defendants Jeff W. Mullins, P.C. and Grace Group, P.C.[20]

---

[16] *See id.*, Vol. II, Ex. 8, Wilkinson deposition, at 49-51; doc. no. 136 (volume II of plaintiff's evidentiary submission in support of its motion for summary judgment), Ex. G, Affidavit of Jan Gill Wilkinson, ¶ 2 at 1.

[17] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Deposition of Mary Hall, at 29.

[18] Doc. no. 184 (plaintiff's evidentiary submission in response to defendants' opposition to plaintiff's motion for summary judgment), Ex. L, Deposition of April St. John, at 16, 29 **(filed under seal).**

[19] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at 58.

[20] *See id.*, Vol. II, Ex. 10, Deposition of Richard Grace, at 49-50; *id.*, Vol. II, Ex. 11,

QORE and Civil Solutions, LLP were not always competitors.  Prior to 2003, Civil Solutions was sometimes unable to perform all facets of its engineering projects in-house, due to limited personnel.  Civil Solutions therefore had a practice of subcontracting other firms in the area, including QORE, to assist.[21]  Indeed, the relationship between the two companies was amiable enough that, in 2002 and 2003, the two companies jointly hosted golf tournaments to entertain select clients.[22]  Through these and other contacts, Mullins and Grace (with Civil Solutions, LLP) became acquaintances, or even friends, with Cook, Kennard, and Lack (with QORE).[23]

## C.   Expansion of Civil Solutions, LLP

Sometime in 2001 or 2002, Mullins and Grace began to discuss plans for expansion of Civil Solutions, LLP.  They recognized that a significant number of the company's projects required work to be done by geotechnical engineers, and it therefore made sense to recruit specialists in that field.[24]  Mullins would ultimately lead the effort to bring in new employees, but he did keep Grace informed of his

Deposition of Jeff W. Mullins, vol. 1, at 29-31, 33, 59.

[21] *See, e.g., id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 79; *id.*, Vol. III, Ex. 15, Deposition of John Cutter, at 45-46.

[22] *Id.*, Vol. III, Ex. 15, Deposition of John Cutter, at 21-22; *id.*, Vol. III, Ex. 16, Affidavit of John Cutter, ¶ 7.

[23] *See, e.g., id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 24-25, 66-67; *id.*, Vol. II, Ex. 10, Grace deposition, at 63-64; *id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 20-23.

[24] *See id.*, Vol. II, Ex. 10, Grace deposition, at 65, 67.

recruitment efforts.[25]

Jeff Mullins's discussions with Bill Kennard, the Senior Geotechnical Engineer at QORE, began sometime in spring or early summer of 2003.[26]  As Mullins recalled, he and Kennard had been friends for a long time, and they met often.  On one occasion, Mullins told Kennard that Civil Solutions was receiving a good deal of geotechnical work, and that instead of subcontracting the business to other firms, Mullins would prefer to perform the work in-house with the assistance of new employees.  When Mullins asked Kennard if he knew any qualified engineers who would consider joining Civil Solutions, Kennard responded that *he* might be interested.[27]  Kennard did have some reservations, however.  Foremost on his mind was that a switch to Civil Solutions — if he were to make it —  smacked of a lateral career move.  What Kennard really wanted, and what he expressed to Mullins, was his desire to acquire "some kind of ownership" in a business venture.[28]

While Mullins understood Kennard's concerns, there seemed to be no easy answers.  In 2003, Mullins and Grace already had invited two employees of Civil

---

[25] *See id.* at 74-75, 99, 105.

[26] *See id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 115-16; *see also id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 42-43.

[27] *See id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 117.

[28] *Id.* at 118-19.

Solutions, LLP (Mike Donnelly and Jennifer Trice) to join the partnership.[29]  In order to make this transition, Richard Grace had relinquished a percentage of his ownership in the partnership, and did not want to give up any more.[30]

Mullins therefore came up with the idea of creating a new entity, which would be incorporated as Civil Solutions, *Inc.* (also a defendant in this case).  Mullins's plan was to have Kennard acquire 24.5 percent of the stock in Civil Solutions, Inc., with Mullins, Grace, Donnelly, and Trice (the individual partners of Civil Solutions, LLP) dividing up the rest.  When Mullins proposed the idea to Kennard in July or early August 2003, Mullins recalled that Kennard was "a little bit nervous."  In Mullins's words, "I was really offering him ownership in a company that didn't exist."[31]

Mullins was nevertheless confident that he had "enough work to keep [Bill Kennard] busy for quite a while," should Kennard decide to go into business with him.[32]  It was Mullins's intention to give Civil Solutions, Inc. all of the geotechnical work (plus the "environmental work") that would otherwise be subcontracted to other firms.  Mullins estimated that he had between $200 and $400 thousand dollars worth

---

[29] *Id.* at 48-49.

[30] *See id.* at 52-53; *id.*, Vol. II, Ex. 10, Grace deposition, at 70.

[31] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 11, Mullins deposition, vol. 1, at 122-23.

[32] *See id.* at 138.

of business that was ready to be allocated.[33]

His initial concerns notwithstanding, Bill Kennard began to firm up his plans to change employers. Kennard recalled that he had a conversation with Diana Lack, whom he supervised at QORE, sometime between August 8 and 15, 2003. Kennard told her for the first time that he had been "talking" to Mullins, and that he might be leaving.[34] According to Kennard, he also "may" have asked Diana Lack if she would be interested in leaving with him, but she "wasn't commital."[35] At some point, Kennard also discussed with Mullins the possibility of recruiting Lack. Mullins testified: "I think what Bill [Kennard] indicated was that without him at QORE, he was sure that Diana [Lack] would seek employment elsewhere and that because of the workload we had, he would like to have her work for us and I agreed."[36]

## D.   Offers of Employment to Bill Kennard, Diana Lack, *and* Brian Cook

Matters quickly escalated on August 12, 2003, when Bill Kennard personally received the following written offer of employment from Jeff Mullins:

---

[33] *See id.* at 141.

[34] *Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 45-46, 48.

[35] *Id.* at 57-58. Lack had a different recollection of the conversation. Lack testified that on August 8, 2003, she and Kennard met at a restaurant after work. *See id.*, Vol. I, Ex. 4, Lack deposition, at 15-17. Kennard told her for the first time that he was leaving QORE, and that he was going into business with Mullins. *See id.* Lack, who considered Kennard to be her "mentor," *id.* at 20, recalled that she immediately volunteered to leave with him, and Kennard's facial expression indicated that he was pleased with her response. *See id.* at 16-17.

[36] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 11, Mullins deposition, vol. 1, at 152.

Dear William:

    Civil Solutions, *Inc.* is pleased to offer you a full-time position as a Professional Engineer in our Decatur Office . . . . Civil Solutions, *Inc.* is offering you a 24.5% ownership in the company . . . . All owners to include yourself, Jeff Mullins, Richard Grace, Jennifer Trice, and Mike Donnelly will be responsible for all assets and liabilities associated with CS *Inc.* . . . .[37]

The offer was signed by Mullins in his capacity as a "Principal" of Civil Solutions, *Inc.*, and Kennard agreed to the terms of the offer the same day.[38]

    Kennard and Mullins then prepared a written offer of employment for Diana Lack, dated August 12, 2003.[39]  The letter offered her a full-time engineer position with either Civil Solutions, LLP, or Civil Solutions, Inc. (the letter was ambiguous on this point[40]), with a proposed salary of $2,036.48 biweekly.  Fringe benefits were to include health, dental, life, and long-term disability insurance.  The letter was signed by Kennard and Mullins, in each individual's capacity as a "Principal" of Civil Solutions, *Inc.*[41]

---

[37] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 3, Kennard deposition, vol. 1, at 51-56 and deposition exhibit 4 (emphasis supplied).

[38] *See id.*

[39] *See id.* at 56 and deposition exhibit 5; *id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 179.

[40] The offer letter bore the letterhead of Civil Solutions, *Inc.*  Kennard and Mullins also signed the document as "Principals" of Civil Solutions, *Inc.*  Nonetheless, the letter also said, "Dear Diana:  Civil Solutions, *L.L.P.* is pleased to offer you a full-time position as a Professional Engineer in our Decatur Office."  Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 3, Kennard deposition, deposition exhibit 5.

[41] *Id.*

Kennard subsequently met with Lack on either August 12 or 13 (no parties were sure[42]), and he handed her the offer letter. Lack recalled the events as follows:

> A.   He said here's your [offer] letter. I asked him what we were doing. He said going to go work for Jeff or maybe start a new company. He hadn't decided. I asked him if we had any work. I asked him are we going to have anything to do.
>
> Q.   What did he say?
>
> A.   He said Jeff [Mullins] has enough work to keep us busy through the end of the year.
>
> Q.   Did he say he had enough work to keep you busy through the end of the year or for the next year?
>
> A.   Jeff [Mullins] has enough work to keep us busy through the end of the year.
>
> Q.   Like the end of 2003?
>
> A.   Yes.[43]

Lack recalled that she was immediately receptive. In her words, she told Kennard that she needed to confer with her husband first, but otherwise, "he could assume that I would accept the offer."[44] Lack testified that she did confer with her husband that evening, and telephoned Kennard after doing so. The record does not

---

[42] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 55-58; *id.*, Vol. I, Ex. 4, Lack deposition, at 30; *id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 179.

[43] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 4, Lack deposition, at 32.

[44] *Id.* at 33. Bill Kennard had a different recollection of her response. Kennard testified that Lack was not immediately certain of her decision, telling him "she would think about it." *Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 58.

specify all that was said during this conversation, but Lack and Kennard did discuss the timing of her resignation.[45]

A day or so later, on August 14, 2003, the Articles of Incorporation of Civil Solutions, Inc. were filed with the State of Alabama.  The document identified Jeff Mullins, Richard Grace, and Bill Kennard as the three members of the corporation's "Initial Board of Directors."[46]   A Subscription Agreement also was filed on August 14.  This document identified Mullins and Grace as the exclusive shareholders of Civil Solutions, Inc.[47]

Additionally, two other documents were prepared and filed.  According to deposition testimony, which was somewhat unclear,[48] the documents were either titled "Unanimous Written Consent in Lieu of the First Meeting of all the Shareholders of Civil Solutions, Inc.,"[49] or "Unanimous Written Consent in Lieu of Organizational Meeting of the Board of Directors of Civil Solutions, Inc."[50]  One of the documents indicated that William Kennard was a shareholder of Civil Solutions, Inc.,[51] and this

---

[45] *See id.*, Vol. I, Ex. 4, Lack deposition, at 33, 35-36.

[46] *See id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 185-86 and deposition exhibit 8.

[47] *See id.*, Vol. III, Ex. 12, Heustess deposition, at deposition exhibit 7.

[48] The court could not locate actual copies of these documents in the record.

[49] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 11, Mullins deposition, vol. 1, at 194.

[50] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 65-68.

[51] *See id.* at 67.

document was signed by Kennard.[52]  This particular document also stated that it was "Executed as of the 14th" of August, 2003,[53] although Mullins testified that Kennard actually signed the document "sometime much later than the 14th of August."[54] Kennard's testimony did not help clarify this point; he remembered "signing something, but Jeff [Mullins] was really handling all of that."[55]

Regardless, with some of these matters settled, Bill Kennard handed in his written notice of resignation to Brian Cook (the Branch Manager) on August 15, 2003.[56]  The notice stated that Kennard's last day of work would be August 29, 2003.[57]  Surprised, Cook asked Kennard what his plans were, and Kennard replied that "he was going to work for Jeff Mullins."[58]  Brian Cook's curiosity's was immediately piqued, because he knew Mullins personally.  Cook wanted to "confront" Mullins the same day to demand a full explanation of what was transpiring.[59]

Meanwhile, at the same time Bill Kennard was meeting with Brian Cook,

---

[52] *See id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 194.

[53] *See id.* at 195.

[54] *See id.* at 197.

[55] *Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 66.

[56] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 3, Kennard deposition, vol. 1, at 42; *id.*, Vol. I, Ex. 2, Cook deposition, at 32.

[57] *Id.*, Vol. I, Ex. 2, Cook deposition, at deposition exhibit 17.

[58] *Id.* at 35.  *See also id.* at 33-34.

[59] *Id.* at 39.  *See also id.* at 38-41.

Diana Lack was meeting with Jan Gill Wilkinson, the Branch Administrator.[60]  Lack and Wilkinson were "friendly" coworkers,[61] and they spoke to each other on "most days."[62]  On this occasion, Lack told Wilkinson for the first time that she and Kennard were planning to leave the company.[63]  Surprised, Wilkinson recalled that she then had following exchange with Lack:

> A.    I remembered asking her something to the effect of just starting up a new business, how are you going to survive, something to that effect.
>
> Q.    What did she say?
>
> A.    She told me that *Bill* [*Kennard*] had been holding jobs that would keep them busy for about a year.[64]

Lack also entrusted Wilkinson with a copy of a resignation letter she had prepared, dated August 15, 2003.[65]  The letter was addressed to Brian Cook (and not Wilkinson), and it stated Lack's intention to resign from her position on August 29,

---

[60] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 4, Lack deposition, at 38-39; *id.*, Vol. II, Ex. 8, Wilkinson deposition, at 110-11.

[61] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 104.

[62] *Id.*, Vol. I, Ex. 4, Lack deposition at 47.

[63] *See id.*, Vol. II, Ex. 8, Wilkinson deposition, at 111-12; *id.*, Vol. I, Ex. 4, Lack deposition, at 39.

[64] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 115 (emphasis supplied).

[65] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 4, Lack deposition, at 44-45; *id.*, Vol. II, Ex. 8, Wilkinson deposition, at 115; *id.*, Vol. I, Ex. 2, Cook deposition, at deposition exhibit 18.

2003.[66]  Lack asked Wilkinson to either "hold on to [the letter],"[67] or to place the letter in her employment file.[68]  Lack subsequently characterized her action as precautionary, in case Brian Cook learned of her decision, and decided to terminate her immediately.[69]

The same morning, Brian Cook and Bill Kennard left the office together and went to see Jeff Mullins at Civil Solutions.[70]  When they arrived, Mullins recalled that Cook "seemed to be a little pissed."[71]  Cook asked Mullins "what in the hell he was doing."[72]  Mullins explained to Cook that he was hiring Kennard to perform geotechnical services for Civil Solutions,[73] and further, that "he was tired of subbing

---

[66] *Id.*, Vol. I, Ex. 2, Cook deposition, at deposition exhibit 18.

[67] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 116.

[68] *Id.*, Vol. I, Ex. 4, Lack deposition, at 45.

[69] There was no love lost between Diana Lack and Brian Cook.  Lack believed that Cook had unfairly berated her work performance on at least one occasion, and she believed that her salary was too low, which she attributed to Cook's decision-making as Branch Manager.  *See id.*, Vol. I, Ex. 4, Lack deposition, at 95-108.  Lack remarked at her deposition that she and Cook had "clashing personalities," and that they did not "get along very well."  She said, even more directly, "I don't like Brian."  *Id.* at 95.

On this day, Lack believed that Cook, after receiving Kennard's notice of resignation, would "walk [her and Kennard] out the door."  *Id.* at 44.  However, Lack was determined that she would not be "fired."  As she testified, "I would not have allowed Brian Cook to fire me.  I would have quit before I let him fire me."  *Id.* at 46.  Hence, Lack entrusted a copy of her resignation letter with Wilkinson.  Lack wanted to get her punch in first, if it came to that.  *See id.*

[70] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 2, Cook deposition, at 46; *id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 74-75; *id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 156-57.

[71] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 156.

[72] *Id.*, Vol. I, Ex. 2, Cook deposition, at 47.

[73] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 158-59.

out work to everybody in town."[74]

Cook then purportedly said, seemingly out of the blue, that "he didn't know how much he wanted to work at QORE without Bill being there."[75]  Mullins also recalled that, sometime during the discussion, Cook asked whether he also "could be made a part of a new venture."[76]  In light of their friendship, Mullins responded that including Cook in the business plans was certainly a possibility.[77]

Cook's potential salary with Civil Solutions ($90,000) was discussed during the meeting.[78]  Mullins intended to give Cook the same ownership interest in the new

---

[74] *Id.*, Vol. I, Ex. 2, Cook deposition, at 48.

[75] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 159.

[76] *Id.* at 159-60.  Brian Cook's testimony suggests that Jeff Mullins, *without any prompting from Cook*, asked him whether he wanted to join the new venture.  *See id.*, Vol. I, Ex. 2, Cook deposition, at 50-51.

[77] As Mullins testified:  "I told him I thought he could [join the business], that we would obviously need to talk about it, but I thought it was something that if he was that interested in it that we could work out."  *Id.*, Vol. II, Ex. 11, Mullins deposition, at 160.  Mullins further explained:

A.   My whole intent was to build a company that would support [Civil Solutions] LLP by providing geotechnical services.

Q.   If that was the case, why did you go to so much trouble to try to find a way to get Brian [Cook] to come?

          . . . .

A.   Primarily because I do care for Brian and, you know, wanted him to be happy in his career.  If we could work something out, we could.  Personally I would have probably — it would have been more to the appeal of [Civil Solutions] LLP to stay with the — with only Bill [Kennard] coming on board.

*Id.* at 258.

[78] *Id.* at 162.

venture as Kennard (24.5%), although the record does not specify whether this information was communicated to Cook.[79]  Mullins went to his computer, opened the electronic file which contained the offer letter he had printed for Kennard, and typed in Cook's name in place of Kennard's.  Although Cook recalled seeing a copy of the letter, there is no evidence that he physically received the letter.[80]  The meeting ended with Mullins being "confident that Bill [Kennard] was going to come to work for us[,] and not knowing what Brian [Cook] was going to do."[81]  Cook also recalled that he was unsure of his plans; first and foremost, he "didn't know if [Mullins] was serious or not" about the offer of employment.[82]

These latest developments did not sit well with all involved.  Jan Gill Wilkinson testified that Diana Lack came into her office later that day, visibly upset.  Wilkinson was first instructed to destroy Lack's resignation letter.[83]  According to Wilkinson, Lack said, "Don't do anything with this resignation.  Things have changed.  Brian Cook . . . is now in on the deal."[84]  Wilkinson also testified as follows

---

[79] *See id.* at 163-64.

[80] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 11, Mullins deposition, vol. 1, at 160-61; *id.*, Vol. I, Ex. 2, Cook deposition, at 51-52.

[81] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 171.

[82] *Id.*, Vol. I, Ex. 2, Cook deposition, at 53.

[83] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 122, 124; *id.*, Vol. I, Ex. 4, Lack deposition, at 60.

[84] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 122.  This evidence is disputed.  First, Lack testified that she wanted her resignation letter destroyed simply because she "had not been walked out the door" by Brian Cook, as she had anticipated.  *Id.*, Vol. I, Ex. 4, Lack deposition, at 60.

that the following conversation took place:

A.    [Diana Lack] said Brian [Cook] and Bill [Kennard] had been in Jeff Mullins's office meeting with he [sic] and, I think, Richard Grace about Brian joining their venture.  She was mad about that.

Q.    How do you know she was mad?

A.    Because she said, "I'm pissed."

Q.    What else?

. . . .

A.    She told me that what she had learned was that Brian was going to open up a CMT [construction materials testing] Department and bring the QORE technicians with him.

Q.    Was it your understanding that Ms. Lack had learned this directly from Mr. Cook?

A.    No, I believe she stated she had talked to Bill [Kennard].

Q.    What happened next?

A.    She said, "This office is history."  She said, "You better get out."

. . . .

A.    She [also] told me that since there would be no PE [Professional Engineers] on staff that that office would not survive and it could close as early as three weeks.  I believe her exact words were, "We'll shut it down in about three weeks."[85]

---

Second, Lack denies that she knew of Brian Cook's discussions with Mullins as of August 15, 2003. *See id.* at 59.  According to Lack, learned this information sometime during the week of August 18, 2003.  *See id.* at 75.

[85] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 122-23, 125.

Wilkinson also testified that sometime on August 15, Diana Lack told her the following:  "She told me that Bill [Kennard] had held $300,000 worth of work,[86] enough to do them for about a year and she said, 'This office is history.'"[87]

Wilkinson returned to the office two days later, on Sunday, August 17.[88] Wilkinson entered the office of Brian Cook, and after a brief search, she located Kennard's resignation letter in Cook's "top middle drawer."[89]  Wilkinson immediately placed a telephone call to Mack McCarley, the Regional Manger.[90]   McCarley understood from his conversation with Wilkinson the following: "information had been conveyed to [Wilkinson] that there was a plan for Mr. Kennard and Ms. Lack

---

[86] According to Diana Lack, she "never said to Jan [Gill Wilkinson] that Bill [Kennard] had $300,000 worth of work lined up."  *Id.*, Vol. I, Ex. 4, Lack deposition, at 87.  Rather, Lack asserts that she "told Jan that Jeff [*Mullins*] had a backlog of $300,000."  *Id.* (emphasis supplied).
    Bill Kennard also testified as follows:

> Q.    Do you recall telling Diana [Lack] that there was enough work that you could bring with you that you would have $300,000 in billings or approximately that much?
>
> A.    No.  I never made that statement.
>
> Q.    Did you make any similar statement?
>
> A.    No.  I wasn't bringing any work with me.

*Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 106.
[87] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 219-220.
[88] *Id.* at 127.
[89] *Id.* at 128.
[90] *Id.* at 130-31.

and possibly Mr. Cook to leave QORE with the intent of taking all of the company's business, all of the company's employees that they wanted with them."[91]  McCarley traveled to Atlanta, Georgia the next day, Monday, August 18, and relayed the information he had received to Dirk Van Reenan, the company President.[92]

### E.   QORE's Investigation

McCarley traveled to the Huntsville office on August 19 to further investigate. McCarley met first with Brian Cook.  During this private meeting, McCarley asked Cook whether he anticipated any personnel changes.  Cook did not mention the resignation letter he had received from Bill Kennard.[93]  McCarley also met privately with Kennard, and asked him if he was aware of any anticipated personnel changes. Kennard said he was not aware of any.[94]  McCarley then briefly met with Jan Gill Wilkinson.  According to Wilkinson, McCarley told her that neither Cook nor Kennard had confirmed any information, but "if anything else came up[,] to call him and let him know."[95]

---

[91] *Id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 75-76.  McCarley initially testified that his first conversation with Wilkinson occurred on August 10, 2003, rather than August 17. McCarley corrected this testimony by way of an errata sheet.  *See* errata sheet located between volumes 1 and 2 of McCarley deposition testimony; *see also id.*, Vol. II, Ex. 9, McCarley deposition, vol. 2, at 347-50 (explaining reason for initial confusion).

[92] *See id.* at 80-85.

[93] *See id.* at 91-95.

[94] *See id.* at 97-98.

[95] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 140.

As QORE's investigation continued, Brian Cook made a second visit to Jeff Mullins in his office at Civil Solutions, sometime between Monday, August 18 and Friday, August 22.[96]  During this meeting, Cook told Mullins that he had given things more thought, and that the prospect of leaving QORE "wasn't that appealing."[97]  Importantly, Cook noted that he was already in a management position at QORE, and he didn't want to risk a demotion in the process of changing employers.[98]

To address Cook's concerns, Mullins proposed that the Board of Directors of Civil Solutions, Inc. could be made up of himself, Cook, Bill Kennard, and Richard Grace, with Cook in charge of construction materials testing.[99]  Mullins also proposed that Cook "would be a vice-president and a partner."[100]  These ideas appeared to have some of the intended effect.  Mullins recalled that the meeting ended with Cook saying that "he was going to think about it."[101]

Brian Cook also met with Bill Kennard on either August 18 or August 19 over

---

[96] Cook testified that he met with Mullins "the week of the 17th through the 23rd."  *Id.*, Vol. I, Ex. 2, Cook deposition, at 105.  Mullins recalled, more specifically, that he and Cook met "sometime between the week of the 18th and the 22nd."  *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 171.  Mullins also testified, "[w]e never met on the weekend, so it must have been somewhere between the 18th and the 22nd."  *Id.* at 210.

[97] *Id.*, Vol. I, Ex. 2, Cook deposition, at 107.

[98] *See id.* at 111, 115.

[99] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 207, 210-213; *id.*, Vol. I, Ex. 2, Cook deposition, at deposition exhibit 34.

[100] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 211-12.

[101] *Id.* at 254.

breakfast.[102]  During this meeting, Cook asked Kennard to reconsider his decision to leave the company.  As Kennard recalled:  "Brian asked if I would reconsider leaving. He thought we made a good team, didn't want to see it broke up [sic], wouldn't want to see me, I guess, in a competitive mode with him."[103]  Kennard merely responded that he "would think about it."[104]

Afterward, Kennard filled out an expense report dated August 23, 2003.[105] Kennard wrote on the report that, on August 18, he had participated in a "marketing breakfast" with Cook and Daniel Osborn of Fuqua Osborn Architects, a Huntsville-based architecture firm.[106]  Kennard testified that he made an error in completing the expense report:

> Danny Osborn wasn't there.  That must be an error of some sort.  Brian Cook and I had gotten together that morning . . . I am not sure why marketing breakfast was put down or why I put marketing breakfast.  I really don't know . . . . I believe that was the breakfast where Brian and I had gotten together and he had asked me to reconsider, and for whatever reason, I got the bill.[107]

---

[102] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 77-78.

[103] *Id.* at 78.

[104] *Id.*

[105] Doc. no. 197, Kennard deposition, Vol. II, at 241-46.

[106] *See id.* at 243-44.  *See also* doc. no. 142 (defendants' evidentiary submission), Ex. LL (Declaration of Daniel C. Osborn).

[107] Doc. no. 197, Kennard deposition, Vol. II, at 244-45.  Daniel Osborn submitted a declaration in support of defendants' motion for summary judgment.  Doc. no. 142 (defendants' evidentiary submission), Ex. LL (Declaration of Daniel C. Osborn).  He states that he "did not have breakfast with Mr. Kennard and Mr. Cook either individually or together on August 18, 2003 or at any other time."  *Id.*, ¶ 7 at 2.

Brian Cook and Bill Kennard also had another conversation in the middle or end of the same week.  Here, Cook learned for the first time of Diana Lack's involvement in the plans.  As Cook recalled:  "I think Bill [Kennard] indicated that — I don't remember exactly what was said, but he indicated that Diana [Lack] had either been asked to come [to Civil Solutions,] or was wanting to come[,] but something along [those] lines tipping me off that that was a possibility."[108]

## F.   Wilkinson's Secret Recordings

Meanwhile, Jan Gill Wilkinson was continuing to gather information about Cook, Kennard, and Lack.  One co-worker who observed Wilkinson's behavior was Mary Hall, Kennard's secretary.[109]  Hall observed that, soon after Wilkinson learned that Kennard and Lack were planning to leave the company, Wilkinson began to make secret recordings of her colleagues' telephone conversations.[110]

QORE's office telephones had two special features:  a "private" button and an "intercom" button.  Hall explained that, if a person pressed the "private" button during a telephone conversation, then the conversation would be just that — private.

---

[108] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 2, Cook deposition, at 69.

[109] *Id.*, Vol. III, Ex. 25, Deposition of Mary Hall, at 29.

[110] *Id.* at 45-46.  Jan Gill Wilkinson denies that she ever recorded or otherwise eavesdropped on telephone conversations between her colleagues, although she does admit she recorded a face-to-face conversation she had with Diana Lack.  *See* doc. no. 136 (Vol. II of plaintiff's evidentiary materials in support of its motion for summary judgment), Ex. G, Affidavit of Jan Gill Wilkinson, ¶¶ 5-6 at 1-2.

However, if the speaker did not press "private," a person in another room could press the "intercom" button on his or her telephone and listen in on the conversation.[111]

Hall observed Wilkinson press the "intercom" button and eavesdrop on at least two occasions. Hall also observed that Wilkinson "had a small recorder, and she would just put it up by the phone and record their conversations."[112]  On one occasion, after making a recording, Wilkinson gave the recording device to Mary Hall so that she could listen. Wilkinson purportedly told her "it was Brian [Cook]," and upon listening to the recording, Hall indeed recognized his voice.[113]  Hall did not remember much else about the recorded conversation.[114]

Oblivious to all of this was Diana Lack, who continued to confide in

---

[111] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at 43, 103.  April St. John was another administrative employee at the Huntsville office.  Her explanation of the telephone system was slightly different from Hall's:

> Q.      . . . . Let's say we've got person one and two in a conversation, and person three wants to listen in.  How would they do that?
>
>         . . . .
>
> A.      Well, yeah, just look at what line one of the two parties was on, if there was two parties in the office, you'd just pick one.  But say, for example, John Cutter, someone else's conversation, you'd know which line he's on and you'd just hit that line and just sit there and listen.

Doc. no. 184 (plaintiff's evidentiary submission in reply to defendants' response to motion for summary judgment), Ex. L, Deposition of April St. John, at 45.

[112] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at 43-44.

[113] *See id.* at 44-46, 132-34.

[114] *See id.* at 133-34.

Wilkinson.  The two spoke on Wednesday, August 20, 2003, and this time, Wilkinson

had a small digital recording device hidden in her brassiere.[115]   The recorded

conversation was transcribed, in part, as follows:

JAN [Gill Wilkinson]:  What's the word?

DIANA [Lack]:  Well there's one last thing to agree upon.  Do you wanna know what the last thing was to agree upon?

JAN:  Probably money.

DIANA:  No, who was going to be the office manager.  Brian [Cook] said absolutely not.  Bill [Kennard] was not going to be manager . . . .

JAN: Bill and Brian looked like they were arguing yesterday . . . . How come, why doesn't Brian want Bill to be running it?  Did Brian get, is he suppose[d] to be buying into it too?

DIANA:  Yeah, they're to be equal partners.  Then Richard Grace and Jeff Mullins will be the two other majority partners . . . .

. . . .

DIANA: It's not a done deal.  Everything is said and done.  Bill is leaving.  Whether Brian goes with him or not.  Bill is leaving.

JAN:  Well, Brian had already committed to it too, you said.

DIANA:  No, Brian hasn't yet . . . .

. . . .

DIANA:  . . . . I don't want Brian at all.  But, the only good thing, the

---

[115] *See id.*, Vol. II, Ex. 8, Wilkinson deposition, at 141, 141.  Lack testified that the encounter occurred "between the 19th and the 21st."  *Id.*, Vol. I, Ex. 4, Lack deposition, at 82.

only good thing is if if [sic] we stay here its [sic] gonna be the same shit all over again every time.

JAN:  Because of Brian.

DIANA:  Because of Brian, but at least in this other situation Brian is not [in] charge of Bill, Brian is not [in] charge of me.  Brian has his folks, Bill has folks and Bill is my boss and that's it.  I don't answer to Brian. . . . . So in that sense, to me that is a better situation then [sic] what I have here.

JAN:  Yeah.  So, did Brian tell him that he was going to turn in his resignation . . . .

DIANA:  Well, I guess the whole thing with Brian, if you think about it, um, this last issue.  And um, to make his decision.

JAN:  Why can't they just be partners in crime, I mean.

DIANA:  Supposedly Bill will leave that Friday and probably like that Saturday or Sunday we will get together the people that they want to take at either Brian or Bill's house.  Tell everybody what is going on and give everybody the opportunity to ask their questions, do their thing, I don't

JAN:  Yeah, but is that safe.

DIANA:  Well, Bill, I because I asked Bill how are [they] planning on transitioning the people and stuff like that.  He said not to worry about um [b]ecause once he leaves, corporate is going to know that something is going on . . .

JAN:  Who, Bill?

DIANA:  Bill.

JAN:  So that's the reason why Brian didn't turn in his resignation

because Brian doesn't want them to know and ask questions.

> DIANA:  Right.  And because of stepping in before everything is said and done.  The the [sic] reason why Brian wants me left here is because corporate is more likely to leave him alone right away because there is a PE [Professional Engineer] on staff.[116]

Wilkinson also testified that there was more to the conversation.  After her discussion with Lack, Wilkinson privately listened to the recording, whereupon she discovered that her equipment had failed to capture the end of the discussion.[117] Therefore, Wilkinson wrote the following on a piece of paper:

> The recorder quit.  There was one other thing that wasn't on it.  Diana said that Bill was already on Civil Solutions payroll.  She said that they already had enough work that was being held to keep them busy for about a year or so, $300K or more.  Also, that Bill was already speaking to his Geo clients that QORE would not have a Geotechnical Dept and no PE on staff and therefore could not do any jobs[,] to send them to him in about 3 wks at Civil Solutions.[118]

Wilkinson then placed a telephone call to Mack McCarley, the Regional Manager, and told him that she had a cassette tape for his review.  Wilkinson and McCarley met on August 21 at a mutually convenient location near Scottsboro, Alabama.  McCarley received the tape, as well as Wilkinson's handwritten note

---

[116] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at deposition exhibit 22 (some ellipses in original).

[117] *See id.*, Vol. II, Ex. 8, Wilkinson deposition, at 159.

[118] Doc. no. 142 (defendants' evidentiary submission), Ex. HH.

describing the end of her conversation with Lack.[119]  Sometime during this meeting, McCarley told Wilkinson, "[i]f you run into anything else, let me know."[120]

McCarley also communicated with QORE President Dirk Van Reenan, and a meeting was arranged for the next day (August 22) in Atlanta, where McCarley was to meet with Van Reenan and four other QORE officials:  Edward Heustess; Rick Heckel; Mark Shearon; and, Johnny Mathis.[121]

At the meeting, McCarley reported the information he had received from Wilkinson.  McCarley also reported that he had met with Cook and Kennard earlier in the week, but no information was forthcoming.[122]  The group decided then that Cook and Kennard would be terminated, but that Lack would be given an opportunity to continue her employment with the company.[123]  All six officials also agreed to travel to Huntsville the following Wednesday, August 27, 2003, to speak to Cook,

---

[119] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at 153-56; *id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 110-11.

[120] *Id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 100-01.

[121] *See id.* at 112-17, 124-25; *id.*, Vol. III, Ex. 24, Van Reenan deposition, at 80-81.
Edward Heustess was the Chief Financial Officer.  *Id.*, Vol. III, Ex. 12, Heustess deposition, at 11.  Rick Heckel was "a vice president" who managed "the Nashville office."  *Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 92.  Mark Shearon was an Atlanta-based Regional Manager.  Johnny Mathis was a "marketer" based in Nashville.  *See id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 38-39.

[122] *See id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 119-20.

[123] *See id.* at 122-23.  McCarley explained the following reasons why Lack's job was to be spared:  (1) "Ms. Lack was not in a leadership role, being responsible for other employees"; and (2) "she was a young professional.  We obviously needed an engineer in the company."  *Id.*

Kennard, and Lack individually.[124]

## G.      Departures of Cook, Kennard, and Lack

Unaware that his termination was being planned, Brian Cook communicated to Jeff Mullins, sometime between August 21 and August 25, that he was no longer interested in leaving QORE.[125]  As Mullins recalled, "I think the gist of it was that at this time he really didn't want to do anything, he just wanted to stay at QORE."[126] Cook testified, "I indicated to [Mullins] that this wasn't the right time for me."[127]

On the other hand, Bill Kennard and Diana Lack pressed forward.  Lack handed in her written notice of resignation to Brian Cook on Monday, August 25.[128] Not much was said during this exchange.[129]  Kennard also advised Cook the next day, August 26, that he had definitely made up his mind to leave QORE.  Both individuals now understood that Kennard's decision was final.[130]

---

[124] *See id.* at 123-24.

[125] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 11, Mullins deposition, vol. 1, at 254-55; *id.*, Vol. I, Ex. 2, Cook deposition, at 133-35.

[126] *Id.*, Vol. II, Ex. 11, Mullins deposition, at 255.

[127] *Id.*, Vol. I, Ex. 2, Cook deposition, at 134.

[128] *See id.*, Vol. I, Ex. 4, Lack deposition, at 151-53.  Cook recalled that he received the resignation letter from Lack on either August 22 or August 25, but he was "leaning towards the 25th." *Id.*, Vol. I, Ex. 2, Cook deposition, at 93.

[129] *See id.*, Vol. I, Ex. 4, Lack deposition, at 153 (Lack testified that nothing was said between her and Cook); *id.*, Vol. I, Ex. 2, Cook deposition, at 94 ("The only conversation was she made some comment, Bill said that she should give this to me instead of him.").

[130] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 80-81; *id.*, Vol. I, Ex. 2, Cook deposition, at 88-90.

Cook testified that on the same day, he met with Mack McCarley in the office parking lot,

McCarley, Van Reenan, Shearon, Heckel, Heustess, and Mathis entered the Huntsville office the next morning, August 27.   Three meetings were conducted simultaneously:  McCarley and Shearon met with Cook; Heckel and Mathis met with Kennard; Van Reenan and Heustess met with Lack.[131]  Lack was advised that she was not being terminated, but instead, she would be given the opportunity to continue her employment with the company.[132]  Cook and Kennard were not so fortunate.  During the course of their meetings, both Cook and Kennard were instructed to "leave" the QORE office immediately.[133]  Van Reenan and McCarley later addressed a gathering of employees, and informed them that Cook and Kennard had been terminated.[134]

After his meeting, Bill Kennard left the office as instructed, and went to see Jeff Mullins.  The two agreed that Kennard would begin as an employee of Civil Solutions, *LLP* (as opposed to Civil Solutions, *Inc.*),[135] and that Kennard would begin

---

and finally advised him that Kennard had submitted a notice of resignation, and that Lack also was prepared to leave.  *See id.*, Vol. I, Ex. 2, Cook deposition, at 80-83.  Importantly, however, McCarley denies that this conversation ever took place.  *Id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 149-50, 319-20.

[131] *See id.*, Vol. II, Ex. 9, McCarley deposition, vol. 1, at 133-35.

[132] *See id.*, Vol. I, Ex. 4, Lack deposition, at 55-56, 158-59; *id.*, Vol. III, Ex. 12, Heustess deposition, at 76-79.

[133] *See id.*, Vol. I, Ex. 2, Cook deposition, at 162; *id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 108.

[134] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 24, Van Reenan deposition, at 124.

[135] The decision to employ Kennard through Civil Solutions, LLP — as opposed to Civil Solutions, Inc. — was a temporary decision purportedly driven by business necessity.  As Grace explained, he and Mullins believed that the entity Civil Solutions, Inc. simply was not ready to

work the following day, August 28.[136]   Brian Cook also visited Jeff Mullins that afternoon, and asked if an offer of employment was "still open."[137]   Mullins responded that they would need to discuss the matter further,[138] but an agreement was reached within two weeks, whereby Cook also became an employee of Civil Solutions, *LLP.*[139]

Finally, after spending an evening contemplating her future, Diana Lack returned to the office on August 28 and advised Mack McCarley that she, too, would be leaving the company.[140]   Lack proceeded directly to the office of Civil Solutions, where she met with Mullins, Kennard, and Cook, among others.[141]   For the time being, Lack also was placed on the payroll of Civil Solutions, *LLP.*[142]

## H.   Mary Hall's Secret Recording

Shortly after leaving QORE, Bill Kennard realized that he had neglected to say

---

support a business, "from a payroll standpoint, from a funding standpoint, from a certificate of authorization standpoint.  In no shape, form or fashion were we ready to start having employees of [Civil Solutions, Inc.]."  *Id.*, Vol. II, Ex. 10, Grace deposition, at 96-97.  *See also id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 94.

[136] *Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 120-25; *id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 262-66.

[137] *Id.*, Vol. I, Ex. 2, Cook deposition, at 204.

[138] *See id.* at 205; *id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 266-67.

[139] *See id.*, Vol. I, Ex. 2, Cook deposition, at 218-19; *id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 267.

[140] *Id.*, Vol. I, Ex. 4, Lack deposition, at 138.

[141] *Id.* at 236-37.

[142] *See id.*, Vol. I, Ex. 11, Mullins deposition, vol. 1, at 93-94.

good-bye to his secretary, Mary Hall.  He therefore decided to call her at her home.[143]

In retrospect, Mary Hall regretted what she did next.[144]  She was momentarily angry

with Kennard because, while she knew all along that Kennard would leave the

company, he had never confided in her.[145]  Therefore, when she learned from a co-

worker that Kennard would call, she decided to record the conversation using a

cassette device that could be connected to her residential telephone line.[146]  The

following conversation was then recorded:

Bill [Kennard]:  How's everything going?

Mary [Hall]:  Okay.

Bill:  That's good.

Mary:  Could be better.

[Bill]:  Well, yeah, I had figured that's about the way it was going to
work out[.]

Mary:  Well, that way absolutely sucked.  I'll flat out tell you that
absolutely sucked.

---

[143] *See* doc. no. 197, Kennard deposition, Vol. II, at 190; doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at 53-56, 122.

[144] According to Mary Hall, she had a "great" working relationship with Kennard — "[h]e was just an extremely nice person, calm . . . a good guy." Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at 39.  She remarked that she recorded her conversation with Kennard because she was "stupid.  That's the only excuse I have.  I'm sorry." *Id.* at 56.

[145] *See id.* at 53-54.

[146] *See id.* at 53-56.

Bill:  I turned in [a] notice a week and a half ago.

. . . .

Mary:  I didn't know that you had turned in a notice.

Bill:  I'm sure that's not being told that I had given it to Brian.  There's a copy of it on my computer, which I'm sure they've seen.  But, you know, all being said, there was a lot of accusations made yesterday [during Kennard's meeting with QORE officials]; none of them are true. You know, I've been accused of being on the payroll —

Mary:  You've been accused of what?

Bill:  Being on this other company's payroll.

Mary:  No, they haven't said that to us.

Bill:  Said it to me.

Mary:  They didn't say that to us.  I swear.  They did not say that to us.

Bill:  I was accused of marketing work for them.  I was accused of bringing work in for them and setting it up, you know.  I was accused of representing myself as an employee of this new company which is all true, um, not true, all a lie.

Mary:  (Laughter)

Bill:  I mean there's no new company set up.  . . . .[147]

The next morning, Mary Hall brought the cassette to work and listened to its contents

with her co-workers, Jan Gill Wilkinson and Whitney Cox.  Afterward, Hall provided

---

[147] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at deposition exhibit 3.

the cassette to Regional Manager Mack McCarley.[148]

## I.  Client Competition, QORE's Continuing Investigation, and the Creation of Geo Solutions, LLC

Van Reenan and his subordinates began a concerted effort to contact QORE's clients on August 28, the day after Kennard and Cook were asked to leave the company.  Van Reenan himself made visits to QORE's top clients, and his goal was to reassure them that, while Kennard and Cook were no longer employees, QORE would be able to provide regular services.[149]

What Van Reenan may not have known, however, was that Kennard, now employed with Civil Solutions, LLP, was competing with him on the very same day. Kennard communicated with several "former clients" on August 28, including representatives from the following entities:  the City of Huntsville, Alabama; SKT Architects;  Fuqua Osborn Architects, P.C.;  and, possibly Chapman Sisson Architects.[150]  The record does not specify what was said between Kennard and each representative, but Kennard did describe the communications as "marketing."[151]

That day, Kennard also communicated with Dale Payton of the Huntsville

---

[148] *See id.*, Vol. III, Ex. 25, Hall deposition, at 55-56.

[149] *See id.*, Vol. III, Ex. 24, Van Reenan deposition, at 128-32.

[150] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 130-31.

[151] *Id.*

*Times*.[152]  Here, some background information is helpful.  There is disputed evidence that, sometime during Kennard's employment with QORE, the company was awarded a project from the Huntsville *Times*.[153]  Although the details of the project are not fully explained in the record, it is undisputed that QORE obtained certain "drawings" from an "architectural or engineering firm" in order to perform the project.[154]  At the very least, Kennard had reviewed "some plans" for Payton and the Huntsville *Times* while he was a QORE employee.[155]

Payton testified that, sometime in late August of 2003, he called QORE's Huntsville office to speak to Kennard.[156]  Payton learned from the person who answered the telephone that Kennard was no longer employed with the company. Payton had no prior notice of Kennard's departure.[157]  According to Payton, he then telephoned Kennard at home, "and learned that he would be part of a new venture."[158] Kennard recalled the events slightly differently, saying, "Dale Payton with the

---

[152] *See id.* at 134.

[153] *See id.*, Vol. I, Ex. 1, Oligee deposition, at 195-96.  However, according to Kennard, the Huntsville Times project was a "new project."  Payton "had not committed that project to QORE." *Id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 134.

[154] *Id.*, Vol. II, Ex. 9, McCarley deposition, at 26, 29.

[155] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 134.

[156] Doc. no. 142 (defendants' evidentiary submission), Ex. KK, Declaration of Dale Payton, ¶ 4 at 1.

[157] *Id.*, ¶ 5 at 2.

[158] *Id.*, ¶ 4 at 1.

Huntsville *Times*, he had actually called my house and gotten my wife's cell number and then called me. And he wanted some testing services done. That was it."[159] Sometime thereafter, Payton decided to award the Huntsville *Times* project to Kennard.[160]

At some point, a representative from the Huntsville *Times* also communicated with QORE's Huntsville office. As Charles Oligee, who replaced Brian Cook as Branch Manager, explained,

> It's my understanding that the client called us and indicated that we were no longer working on that project. In an effort to try and address why he made that decision, we attempted to locate the drawings [related to the project]. When we were unable to locate the drawings[,] [we] were unable to respond to his pulling us off the project.[161]

Oligee also testified:

> That was work that was QORE's, that upon the termination of the defendants that work was subsequently pulled from QORE. We believe that they had the drawings in their possession at that time, which gave them an unfair advantage in obtaining that work and taking that work over to their new business.[162]

Meanwhile, also on August 28, either Van Reenan or Heustess transported

---

[159] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 3, Kennard deposition, vol. 1, at 134.

[160] *See* doc. no. 142 (defendants' evidentiary submission), Ex. KK, Payton declaration, ¶ 8 at 2.

[161] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 1, Oligee deposition, at 107-08.

[162] *Id.* at 195-96.

from Huntsville to Atlanta the computer units that had been assigned to Lack, Cook, and Kennard.   They were then inspected by the employees of Life-Cycle Technologies, Inc. ("Life-Cycle"), which regularly performed computer-related services for QORE.[163]   Upon examination, Life-Cycle's technicians noted that QORE's computers operated on a Microsoft Windows 2000 server.   An employee was required to supply a confidential log-in and password to access the server from his or her assigned computer.   Once logged onto the server, the employee could access a number of software programs, including the QORE Information System ("QIS"), which was a company database used for marketing, job tracking, and billing purposes.   To access the QIS, the employee had to supply a different confidential log-in and password specific to QIS.[164]

Life-Cycle found no abnormal uses of the computers assigned to Brian Cook or Bill Kennard.[165]   Lack's computer was a different matter, however.   After analyzing her computer, Life-Cycle determined that large amounts of information had been retrieved from the QIS and "dumped" onto Lack's hard drive on August 12, 2003.[166]   Specifically, Life-Cycles determined that two databases had been accessed.   The first

---

[163] *Compare id.*, Vol. III, Ex. 12, Heustess deposition, at 84-85, 88 *with id.*, Vol. III, Ex. 24, Van Reenan deposition, at 147-49.

[164] *See id.*, Vol. II, Ex. 6, Affidavit of Paul James, ¶¶ 7, 9.

[165] *See id.*, Vol. III, Ex. 12, Heustess deposition, at 89.

[166] *Id.*, Vol. II, Ex. 6, James affidavit, ¶ 10 at 3.

database identified QORE's clients dating back to January 1998 (the "client list"). The client list identified the client's name, location, information, and client representative. The second table identified the projects that QORE had performed dating back to January 1998 (the "job list"). The job list specified the name of the project, where the project was performed, the "job date,"[167] the name of the client, and the client representative.[168]

Of the thousands of entries in the job list,[169] one was for a Sam's Wholesale Center located on University Drive, Huntsville, Alabama. The full entry identified the job number ("8039"), the "job name" ("CEI/SAMS/UNIVERSITY DRIVE"), where the project was to be performed ("UNIVERSITY DRIVE (WEST OF RIDEOUT ROAD)"), the "job date," ("11/2/00"), the client "contact" ("STUART RAYBURN"), the client's name ("CEI"), and the client's address ("TWO INTERNATIONAL PLAZA," "SUITE 300," "NASHVILLE, TN").[170]

---

[167] The record does not clearly identify whether the "job date" represents the date on which a project was commenced, completed, or otherwise. *But see* doc. no. 163 (plaintiff's evidentiary submission), Ex. 12, Heustess deposition, at 123 (testimony suggesting that the "job date" represents the date "the first work was done").

[168] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 6, James affidavit, ¶¶ 13-19; *id.*, Vol. II, Ex. 7, Affidavit of Jan Gill Wilkinson, Ex. 5 (client list) and 6 (job list) (filed under seal). *See also id.*, Vol. III, Ex. 13, Affidavit of Mack McCarley, ¶¶ 3 and 6; *id.*, Vol. III, Ex. 14, Affidavit of Charles Oligee, ¶¶ 3-4.

[169] The job list is 110 pages long. By the court's count, each page includes tens of entries.

[170] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 7, Affidavit of Jan Gill Wilkinson, Ex. 6 (job list) at page 14 of 110 (filed under seal).

Similar entries were included for the following:  a job named "LOWES HIGHWAY 72," performed in Madison, Alabama, with the "job date" of February 10, 1998;[171] jobs named "RESEARCH PARK OFFICE CENTER" ("phases" I, II, and III), performed for a client located in Huntsville, Alabama, with "job dates" in 1998 and 1999;[172] a job named "SATURN V — USSRC," performed for a client located in Huntsville, Alabama, with "job dates" in 1999;[173] and, a job named "BABY'S [sic] R US," performed on "HWY 72 @ TARGET COMPLEX," with an August 1, 2001 "job date."[174]

Upon further investigation of Lack's computer, Life-Cycles found that the client list and the job list were put into electronic spreadsheets,[175] and the spreadsheets were then compressed into "zip" files, used to transport large volumes of electronic information.[176]  As James explained, "[l]arge files that are difficult to e-mail or downlo[ad] to portable devices such as palm pilots, for example, can be readily transferred or e-mailed once placed in a 'zip' format."[177]  Life-Cycle further

---

[171] *See id.* at page 54 of 110.

[172] *See id.* at 47 of 110.

[173] *See id.* at 96 of 110.

[174] *See id.* at 108 of 110.  U.S. Highway 72 is an east-west highway that runs through Northern Alabama.

[175] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 6, James affidavit, ¶¶ 12-16, at 4-5.

[176] *Id.*, ¶ 19.

[177] *Id.*

determined that after the zip files were created, both the spreadsheets and the zip file were deleted from Lack's computer.[178]   Life-Cycle reported these findings to Heustess,[179] and Heustess, in turn, advised Van Reenan that Lack's "hard drive had been cleaned."[180]   Lack denies that she ever downloaded the job list or the client lists from the QIS.[181]   It is undisputed that Lack had received a QORE employee handbook

---

[178] *Id.*

[179] *Id.*, Vol. III, Ex. 12, Heustess deposition, at 93-94.

[180] *Id.*, Vol. III, Ex. 24, Van Reenan deposition, at 152.

[181] Lack testified at her deposition as follows:

Q.  Have you ever transferred the data from the job and client files of QORE in any way from QORE's QIS system or from your work PC outside of QORE?

A.  No.

Q.  You've never done that?

A.  No.

Q.  You've never made a disk of the job files at QORE?

A.  I don't recall ever doing that.

Q.  You've never made a disk of the client files at QORE?

A.  I don't recall ever doing that.

Q.  Have you ever E-mailed the job files at QORE to any other computer?

A.  I don't recall doing that.

Q.  Have you ever E-mailed the client files at QORE to any other location?

A.  I don't recall doing that.

Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 4, Lack deposition, at 55.  *See also id.*

on August 3, 2003, advising her that "[a]ll information concerning the services performed for clients is considered confidential."[182]

QORE retained the assistance of John Gamble of the Atlanta office of the law firm known as Fisher & Phillips, LLP, and a flurry of correspondence commenced in late August.  On August 29, 2003, Gamble sent a letter to Richard Grace in his capacity as a registered agent of Civil Solutions, *Inc*.  QORE warned that it was investigating the events surrounding the departures of Cook, Kennard, and Lack, and that a lawsuit might be filed against "any of the principals or agents of Civil Solutions, *Inc.*, or any related companies."[183]  On September 9, 2003, Bartley Loftin of the Huntsville office of the law firm known as Balch & Bingham, LLP, responded to Gamble's letter on behalf of Civil Solutions, Inc., denying any wrongdoing.[184] Gamble also sent a letter to Diana Lack on September 11, 2001, demanding that she return any and all property in her possession, including any lists of jobs or clients, that rightfully belonged to QORE.[185]  Gamble also sent a reply letter to Loftin on

---

at 50 (testifying that *if* she ever downloaded any job lists and client lists, it *may* have been to compile a list for a QORE-sponsored golf tournament and a "Christmas list").

    [182] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 7, Affidavit of Jan Gill Wilkinson, ¶ 7 at 3, and affidavit exhibits 1 and 4 (filed under seal).  Bill Kennard and Brian Cook also received the employee handbook.  *See id.*, affidavit exhibits 2 and 3.

    [183] *Id.*, Vol. III, Ex. 21, Declaration of Counsel, at exhibit 6 (emphasis supplied).

    [184] *See id.* at exhibit 3.

    [185] *See id.* at exhibit 1.

September 15, 2003, demanding that Loftin's "clients"[186] immediately return any and all property belonging to QORE, which was "wrongfully and illegally taken."[187]

During the same time period, Jeff Mullins, Richard Grace, Bill Kennard, and Brian Cook began to have second thoughts about doing business through Civil Solutions, *Inc.*[188]  Mullins recalled that these conversations started "probably in the first week of September [2003]."[189]  As Mullins explained, the original plan was to have Civil Solutions, *LLP* subcontract its geotechnical work to Civil Solutions, *Inc.*, with Bill Kennard heading up the newly established corporation.  The addition of Brian Cook, however, meant that there would also be an emphasis on attracting business in the field of construction materials testing ("CMT").  Mullins, Grace, Kennard, and Cook purportedly believed that, due to certain industry practices, the name "Civil Solutions" would hinder the company's ability to attract CMT business.[190]

---

[186] The letter did not specifically identify who the "clients" were.  However, Mr. Loftin is counsel of record for all defendants in this action with the exception of Diana Lack.

[187] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 21, Declaration of Counsel, at exhibit 4.

[188] *See id.*, Vol. II, Ex. 10, Grace deposition, at 107.

[189] *Id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 204.

[190] *See id.* at 134-35.  *See also id.*, Vol. II, Ex. 10, Grace deposition, at 107-08; *id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 39-40.

Mullins explained as follows.  In most projects, the hired engineering firm may advise the client on the selection of a firm to perform the incidental CMT work.  According to Mullins, his concern was that because other engineers in the Huntsville area would view Civil Solutions, *LLP* as a competitor, they would not recommend another "Civil Solutions" business to perform the

Accordingly, it was agreed that a new entity would be formed, and it would do business under the name "Geo Solutions."  The Articles of Organization of Geo Solutions, LLC was filed on September 17, 2003, and the document specified that the limited liability company was comprised of two professional corporations and two corporations:  Grace Group, P.C.; Jeff W. Mullins, P.C.; W. Kennard, Inc.; and, Brian Cook, Inc.[191]  As explained earlier, Grace Group, P.C. and Jeff W. Mullins, P.C. were created in 1999 by Richard Grace and Jeff Mullins, respectively, for the purpose of operating Civil Solutions, LLP.   On the other hand, Brian Cook, Inc. was incorporated on September 18, 2003, a day after the Articles of Organization for Geo Solutions was filed.[192]  The record does not specify the date of incorporation for W. Kennard, Inc., but Bill Kennard suggested that it was at about "the time we were setting this up [*i.e.*, Geo Solutions, LLC]."[193]  All of these entities are defendants in this case.

As will be discussed below, Bill Kennard began to solicit business under the banner of "Geo Solutions" within five weeks of leaving QORE.  For all intents and purposes, however, Geo Solutions, LLC remained an empty shell until February of

---

incidental CMT work.  *See id.*, Vol. II, Ex. 11, Mullins deposition, vol. 1, at 135.

[191] *See* doc. no. 142 (defendants' evidentiary submission), Ex. U.

[192] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 2, Cook deposition, at 226.

[193] Doc. no. 197, Volume II of Kennard deposition, at 216.

2004.[194]

## J.    Commencement of Suit, and Continuing Competition for Clients

QORE commenced this suit on October 7, 2003, originally naming Civil Solutions, Inc., Bill Kennard, Brian Cook, and Diana Lack as defendants.[195]   That action did not deter the escalating competition, however.   Bill Kennard, in his capacity as "Partner" of Geo Solutions, LLC, submitted a proposal letter to Tony Repucci on or about October 23, 2003.[196]   Mr. Repucci was General Manager of a business called Regal Auto Plaza, located in Huntsville, Alabama.   Kennard's letter set forth a recommended scope of engineering services related to a proposed Mercedes dealership.   The letter also set forth the qualifications of the "principals" of Geo Solutions as follows:

### Qualifications

The principals of GEO Solutions have been involved in a majority of the major projects in the Huntsville/Madison area in the past 10 years.   A sampling of a few recent projects we have been involved with in the immediate site vicinity include, the following:

---

[194] Geo Solutions, LLC did not operate immediately.   Among other matters, the entity still needed to apply for, and receive, certain certification from the State of Alabama.   *See* doc. no. 197, Volume II of Kennard deposition, at 220-21.   Therefore, for the time being, Kennard, Cook, and Lack remained employees of Civil Solutions, *LLP*.   Indeed, these defendants did not begin to draw their salaries and benefits from Geo Solutions, LLC until the first week of February 2004.   *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 11, Mullins deposition, at 93-94.

[195] *See* doc. no. 1.

[196] *See* doc. no. 180 (defendants' supplemental evidentiary submission), Ex. B.

46

- Providence Community
- DC Park Retail Development, Interior Roadways
- Best Western Hotel, DC Park
- Residence Inn, West Park Center
- Babys-R-Us, Target Center
- First Commercial Bank Office Building
- Sams Club, University Drive
- Miltec Office Building, Cummings Research Park
- Logans Roadhouse, DC Park
- Carmike Cinema Complex, Old Monrovia Pike
- Lowes, U.S. Highway 72 West
- Bradford Office Center, Research Park Boulevard
- New Western Area High School, Cummings Research Park[197]

Meanwhile, on another front, the architectural "drawings" related to the Huntsville *Times* project reappeared in QORE's Huntsville office. Whitney Cox, who had once worked for Brian Cook, testified as follows:

> In approximately late October or early November of 2003 the Huntsville Times drawings reappeared in our office in a prominent place in Bill Kennard's office. Bill Kennard's office had been thoroughly searched in late August of 2003 when the plans were initially discovered missing . . . . I was very surprised that the drawings turned up because in August of 2003 Jan Gill Wilkinson, Mary Hall, and I searched the entire office for the drawings and had not been able to find them.[198]

Charles Oligee, who was the new Branch Manager, investigated. As he recalled, "I inquired with anyone who had any knowledge of being in that office, anyone who had

---

[197] *Id.* at pages 1-2 of proposal letter. *See also* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 1, Oligee deposition, at 82-83; *id.*, Vol. III, Ex. 12, Heustess deposition, at 109-11.

[198] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 23, Affidavit of Whitney Cox, ¶ 8 at 2-3. *See also id.*, Vol. III, Ex. 14, Oligee affidavit, ¶ 7 at 2-3.

been near the office, anyone who had been seen going in and out of that office, and no one . . . . No one was aware of how they returned."[199]

Discovery in this lawsuit commenced soon after.[200]  Spurred on perhaps by recent events, QORE propounded a request for "[a]ll property of QORE in the possession, custody or control of Defendants."[201]  In response, defendants collectively returned the following items on December 10, 2003:[202]  (i) a resisitivity meter manual;[203] (ii) a Health and Safety Manual;[204] (iii) a toolbox; and (iv) a "Statement of Qualifications" that had been prepared for the purpose of soliciting business from a company called O&S Holdings, LLC.[205]  The last item, the Statement of Qualifications for O&S Holdings, was dated January 17, 2003, and it had been signed by Brian Cook.[206]

---

[199] *Id.*, Vol. I, Ex. 1, Oligee deposition, at 199.

[200] The parties filed their planning report on November 17, 2003.  *See* Fed. R. Civ. P. 26(d).

[201] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 21, Declaration of Counsel, at exhibit 2.

[202] *See id.*, Vol. III, Ex. 21, Declaration of Counsel, ¶ 3 at 2 (listing items that were returned).

[203] The resistivity meter manual was just that — a manual authored by the equipment manufacturer for the purpose of instructing the user of the resistivity meter.  *See id.*, Vol. I, Ex. 1, Oligee deposition, at 103-04.

[204] The Health and Safety Manual was authored by QORE.  It outlined the company's policy for employee health and safety.  *See id.*, Vol. I, Ex. 1, Oligee deposition, at 92-94.

[205] An unsigned copy of this document was submitted into evidence.  *See* doc. no. 180 (defendants' supplemental evidentiary exhibits), at Ex. E.

[206] *See id.*; *see also* doc. no. 163 (plaintiff's evidentiary submission), Vol I, Ex. 1, Oligee deposition, at 89 ("There is a statement of qualifications that was generated by QORE which was signed by Brian Cook").

O&S Holdings is a California-based real estate development firm that was then, and still is, involved in the development of Cummings Research Park, a science and technology center located in Huntsville, Alabama.[207]  Specifically, O&S is involved with the development of the "Bridge Street Town Centre" that will include approximately 2,000,000 square feet of retail, restaurant, entertainment, office, hotel, and residential space.[208]  Among other matters, the January 17 Statement of Qualifications presented an overview of QORE's corporate organization, the Huntsville personnel, and the staff's prior work experience.[209]

Four months after the items identified above were returned as part of discovery, Bill Kennard and Brian Cook, each in his capacity as a "Partner" of Geo Solutions, LLC, sent a proposal letter to Brett Thorton of O&S Holdings.[210]  The letter was dated March 17, 2004.  Cook and Kennard proposed that Geo Solutions perform the geotechnical engineering services related to the Bridge Street Town Center

---

[207] *See* doc. no. 180 (defendants' supplemental evidentiary exhibits), Ex. E, Statement of Qualifications, at "Letter of Introduction"; *id.*, Ex. A, March 17, 2004 proposal letter, at section titled "Proposed Construction."  *See also* description of the proposed project, *available at* http://www.osholdings.com (navigate through "Portfolio" icon, then "Future Developments" and "Bridge Street Town Centre — Huntsville, Alabama.").

[208] *See* description of the proposed project, *available at* http://www.osholdings.com (navigate through "Portfolio" icon, then "Future Developments" and "Bridge Street Town Centre — Huntsville, Alabama.").

[209] *See* doc. no. 180 (defendants' supplemental evidentiary exhibits), Ex. E, Statement of Qualifications.

[210] *See id.*, Ex. A.  *See also* doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 12, Heustess deposition, at 122-23.

development.   The letter set forth the scope of proposed services, fees, and

importantly, the following qualifications of the Geo Solutions "principals":

### <u>Qualifications</u>

The principals of GEO Solutions have been involved in numerous major projects in the Huntsville/Madison area in the past 10 years.  Further, GEO Solutions principals have extensive experience in Cummings Research Park.  A few of the recent projects we have been involved with in the immediate site vicinity include the following:

- Saturn V Replica, US Space and Rocket Center
- SCI Diamond Avenue Plants
- First Commercial Bank Office Building
- Sams Club, University Drive
- Miltec Office Building, Cummings Research Park
- Aegis Office Building, Cummings Research Park
- Mevatec Facilities, Voyager Way, Cummings Research Park
- Research Park Office Center, Phases 1 thru 4
- Bradford Office Center, Cummings Research Park
- CRS Office Building, Voyager Way, Cummings Research Park
- New Western Area High School, Cummings Research Park
- Providence Community
- DC Park Retail Development, Interior Roadways
- Best Western Hotel, DC Park
- Residence Inn, West Park Center
- Providence Community, Providence Main Street[211]

Cook and Kennard followed up with another proposal letter to Thorton, dated

June 1, 2004.[212]  This letter essentially restated the "Qualifications" of the Geo

---

[211] Doc. no. 180 (defendants' supplemental evidentiary submission), Ex. A, at pages 1-2 of proposal letter.

[212] *See* doc. no. 142 (defendant's evidentiary submission), Ex. GG.

Solutions "principals" which had been included in the March 17 correspondence.[213] Geo Solutions's bid was ultimately successful.[214]

## II. PROCEDURAL BACKGROUND

The original complaint filed on October 7, 2003,[215] was twice amended: on February 6, 2004,[216] and again on July 12, 2004.[217] Bill Kennard, Diana Lack, and Brian Cook each filed an answer and counterclaims to the first amended complaint on February 24, 2004.[218] Each counterclaimant asserted, in part, a violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq*. Diana Lack subsequently moved to voluntarily dismiss her counterclaim brought under the Act.[219] The motion was granted.[220] Bill Kennard also moved to voluntarily dismiss his federal counterclaim, and that motion was granted.[221] Unlike Lack and Kennard, Brian Cook did not file a motion to dismiss his Omnibus Crime Control Act claim.

---

[213] *See id.*

[214] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 1, Oligee deposition, at 205-06.

[215] Doc. no. 1.

[216] Doc. no. 35.

[217] Doc. no. 76.

[218] Doc. nos. 52-54.

[219] Doc. no. 93.

[220] Doc. nos. 94.

[221] Kennard's motion (doc. no. 114) was stamp-granted on November 22, 2004.

QORE filed a motion for summary judgment on the remaining counterclaims asserted by Cook and Kennard,[222] but did not seek summary judgment on Lack's counterclaims. In turn, defendants filed for summary judgment on the claims asserted in the second amended complaint. One motion was filed by Diana Lack,[223] and the other motion was filed by the remaining defendants, who refer to themselves as the "Geo Solutions Defendants."[224] The motion filed by the Geo Solutions defendants had an alternative component as well. In the event that summary judgment were not granted on all claims, defendants moved for an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy. *See* Fed. R. Civ. P. 56(d).

## III. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

For convenience and clarity, QORE's claims will not be addressed in numerical order, but as follows: breach of fiduciary duties (Count III); fraudulent suppression of material facts (Count V); tortious interference with contractual and business relations (Count IV); violations of the Alabama Trade Secrets Act (Count II); conversion (Count I); conspiracy (Count VI); and, corporate liability (Count VII).

## A.   Breach of Fiduciary Duties (Count III)

---

[222] Doc. no. 133.

[223] Doc. no. 138.

[224] Doc. no. 140.

"The corporate fiduciary duty is divided into two parts:  (1) a duty of care; and (2) a duty of loyalty." *Massey v. Disc Manufacturing, Inc.*, 601 So. 2d 449, 456 (Ala. 1992).  The duty of care requires corporate officers to act as "ordinarily prudent and diligent men under similar circumstances." *Id.* (citing *Briggs v. Spaulding*, 141 U.S. 132, 152 (1891) (internal markings and ellipses omitted)).  The duty of loyalty, on the other hand, prohibits faithlessness and self-dealing by corporate officers.  *See Massey*, 601 So. 2d at 456.  *See also, e.g., Alagold Corporation v. Freeman*, 20 F. Supp. 2d 1305, 1310 (M.D. Ala. 1998) (duty of loyalty "encompasses a duty to disclose information to those who have a right to know the facts"); *Belcher v. Birmingham Trust National Bank*, 348 F. Supp. 61, 82 (N.D. Ala. 1968) (the duty of loyalty of "officers and directors are analogous to those of trustees.  They are required to act with fidelity and in good faith, subordinating their personal interests to the interests of the corporation.").

Alabama Code § 10-2B-8.42 states that a corporate officer owes a fiduciary duty in the following respects:

(a) An officer with discretionary authority shall discharge his or her duties under that authority:

(1)  In good faith;

(2)  With the care an ordinary prudent person in a like position would exercise under similar circumstances; and

(3)  In a manner he or she reasonably believes to be in the best interests of the corporation.

Ala. Code § 10-2B-8.42 (1975) (1999 Replacement Volume).

### 1.    Brian Cook

It is undisputed that Brian Cook was a corporate officer (vice president) of QORE and, therefore, was required to act with utmost loyalty and care.  Cook received a resignation letter from Bill Kennard on August 15, 2003.  Construing the evidence in the light most favorable to the party opposing summary judgment, Cook failed to advise upper management of the notice until August 27.  In the interim, Cook advised Mack McCarley that there were no anticipated personnel changes at the Huntsville office, when he clearly knew there were.  Indeed, at the time of his conversation with McCarley, Cook was entertaining an employment offer from Jeff Mullins, to join a business venture in competition with QORE.  Given these facts, a reasonable jury could find that Cook breached both his duty of care *and* his duty of loyalty in failing to give notice of Kennard's resignation.  Summary judgment will be denied.

### 2.    Bill Kennard

Bill Kennard was a Senior Geotechnical Engineer, and in that capacity he was charged with the responsibility of heading up the geotechnical department at the

Huntsville office, and supervising the employees in that department, including Diana Lack.  There is no evidence, however, that Kennard was either an officer or director of the company and, accordingly, the fiduciary duties required by § 10-2B-8.42 of the Alabama Code do not apply.

The court must therefore turn to the common law to determine what, if any, fiduciary duties were owed by an employee in the position of Kennard.  In *Allied Supply Company, Inc. v. Brown*, 585 So. 2d 33 (Ala. 1991), the employer asserted a breach of fiduciary duty claim against three employees, Mark Brown, Deborah Christopher, and David Graben.  *See id.* at 34.  Brown and Christopher were officers of the corporation, but Graben, who held a "managerial" position, was not.  *See id.* at 34-35.  In discussing the employer's breach of fiduciary duty claim, the Court invoked the common law principles of the agent-principal relationship, saying:

> It is an agent's duty to act, in all circumstances, with due regard for the interests of his principal, and to act with the utmost good faith and loyalty.  *Williams v. Williams*, 497 So.2d 481 (Ala.1986).  Implicit in this duty is an obligation not to subvert the principal's business by luring away customers or employees of the principal, or to otherwise act in any manner adverse to the principal's interest.  *See Naviera Despina, Inc. v. Cooper Shipping Co.*, 676 F.Supp. 1134 (S.D.Ala.1987).

*Allied*, 585 So. 2d at 37.  Importantly, the Court did not exclude Graben from this discussion, although he held a managerial position only.  This court therefore gleans from *Allied* that a managerial employee, like Kennard, has a duty of loyalty to his

employer in performing the duties he is charged to complete, including (i) supervising the employees under his direction, and (ii) communicating with the employer's customers.

Having determined that Kennard owed a duty of loyalty to his employer, it is important to note that such a duty was not unconditional.  For example, the duty of loyalty cannot prevent an employee from striking out on his own, to compete with his former employer.  As was favorably quoted a half-century ago in *James A. Head & Company, Inc. v. Rolling*, 90 So. 2d 828 (Ala. 1956):

> From the standpoint of an employer, it may seem unjust that a faithful employé [sic] for a number of years, who has learned the business and become almost a part of it, shall leave and engage for himself in a competitive business; but the employer has no right to his continuance in service, no right to control his activities, no just objection that he engage competitively in a like business and make a career for himself, nor a right to the continued patronage of former patrons.  The employé has as much right to start a new business and endeavor to establish it as had his employer to start his business which has become established.

*Id.* at 840 (quoting *Boone v. Krieg*, 194 N.W. 92 (1923)).

Of course, the rub in this case is that Bill Kennard laid a foundation for a competing enterprise while he was still employed with QORE.  As one commentator has observed, an employee has a *limited* right to prepare for competition with his employer while he is still on the payroll.  *See* Christopher Lyle McIlwain, *Backstab: Competing with the Departing Employee*, 29 Cumb. L. Rev. 615, 622-23 (1999)

(observing that the right to prepare for competition "is not without limitations or hazard in its exercise.  In essence, the employee may build his 'nest,' but may not 'feather' or make use of it at the expense of his employer while he is still on the payroll.")

QORE asserts that Bill Kennard breached his duty of loyalty with each of the following acts:  (1) Kennard accepted an ownership interest in Civil Solutions, Inc. on August 12, 2003; (2) Kennard gave Diana Lack a written offer of employment on behalf of Civil Solutions, Inc., on August 12 or 13, 2003; (3) Kennard held a "marketing breakfast" with Daniel Osborn of the Huntsville-based architecture firm Fuqua and Osborn Architects, P.C. on August 18, 2003; (4) Kennard "held back" $300,000 of work while he was employed with QORE; and (5) Kennard performed substandard work during the last months of his employment with QORE.[225]  Each component will be addressed in turn.

### a.    Accepting an ownership interest in Civil Solutions, Inc.

Kennard accepted a written offer of employment with Civil Solutions, Inc., on August 12, 2003.  The offer guaranteed him an ownership interest in the new venture (24.5%), and Kennard anticipated that Civil Solutions, Inc. would be in direct competition with QORE.  Articles of Incorporation for Civil Solutions, Inc., were

---

[225] *See* doc. no. 76 (Second Amended Complaint), ¶ 17 at 5-6; doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 51-56.

filed on August 14.   Additionally, two other documents were prepared.   The documents were either titled "Unanimous Written Consent in Lieu of the First Meeting of all the Shareholders of Civil Solutions, Inc.," or "Unanimous Written Consent in Lieu of Organizational Meeting of the Board of Directors of Civil Solutions, Inc."   Construing the evidence in the light most favorable to the party opposing summary judgment, one of the documents identified Bill Kennard as a shareholder of Civil Solutions, Inc., and it was signed by Kennard.   The signed document also stated that it was executed as of the 14th of August, 2003. Kennard turned in his written notice of resignation to his supervisor, Brian Cook, on August 15.   This was Cook's first notice that Kennard was planning to leave the company.

The parties do not cite, and the court could not locate, an Alabama case that addresses facts similar to the ones presented here.   Nonetheless, other courts have held that an employee does not violate the duty of loyalty to his employer merely by organizing a corporation for the purpose of carrying on a competing business after the expiration of his employment.   *See ACI Chemicals, Inc. v. Metaplex, Inc.*, 615 So. 2d 1192, 1198 (Miss. 1993) (holding that an employee did not breach his fiduciary duty to his employer where he merely incorporated rival business before he was terminated); *Las Luminarias of the New Mexico Council of the Blind*, 587 P.2d 444, 449 (N.M. Ct. App. 1978) (holding that "an employee does not violate his duty of

loyalty when he merely organizes a corporation during his employment to carry on a rival business after the expiration of [his] term of employment"). *Cf. Radiac Abrasives, Inc. v. Diamond Technology, Inc.*, 532 N.E. 2d 428, 434 (Ill. App. Ct. 1988) (stating that, "before the end of his employment, an agent can properly purchase a rival business and upon termination of employment immediately compete") (citation omitted). This court believes that the Supreme Court of Alabama would agree with the foregoing decisions.

In the alternative, QORE asserts that Bill Kennard's acquisition of an ownership interest in Civil Solutions was in direction violation of a code of ethics applicable to licensed professional engineers; and, such a violation constituted a breach of fiduciary duty.[226]  As a preliminary matter, QORE does not cite, and the court could not locate, an Alabama case where a violation of the engineers' code of ethics was tantamount to a breach of fiduciary duty under Alabama law.  However, even if such an analysis were applicable, QORE's argument would be unavailing on the merits.

The Alabama State Board of Licensure for Professional Engineers and Land Surveyors (the "Board") is authorized under Alabama law to adopt and amend rules of professional conduct for professional engineers.  *See* Ala. Code §§ 34-11-30 and

---

[226] *See* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 52-53.

34-11-35 (1975) (2002 Replacement Volume).   In particular, the Board has promulgated rules pertaining to the engineer's obligation to avoid conflicts of interests with his employer and his clients, and these guidelines are set forth in Chapter 330-X-14.02 of the Alabama Administrative Code.   QORE specifically directs the court to subsection (b) of this rule, which states:

> The engineer or land surveyor shall exercise independent judgments, decisions and practices on behalf of clients and employers as follows:
>
> . . . .
>
> (b)   The engineer or land surveyor shall not solicit or accept any gratuity, material favor or benefits of any substantial nature from any party, agent, servant or employee dealing with his or her client or employer *in connection with any project on which he or she is performing or has contracted to perform engineering or land surveying services.* This solicitation or acceptance includes, but is not limited to any act, article, money or other material possessions which is of such value or proportion that its acceptance creates a clandestine obligation on the part of the receiver or otherwise compromises his or her ability to exercise his or her own independent judgment.

Ala. Admin. Code r. 330-X-14.02(b) (1998) (emphasis supplied).

Chapter 330-X-14.02(b) specifies that an engineer shall avoid conflicts of interests with regard to "any projects on which he or she is performing or has contracted to perform."   QORE does not articulate how Bill Kennard created a conflict of interest with regard to a particular project, then under his supervision,

merely by accepting an ownership interest in Civil Solutions. This court also could not ascertain a specific conflict from the record.

Kennard's motion for summary judgment on this aspect of the claim is due to be, and will be, granted.

###     b.    Written offer of employment to Diana Lack

A managerial employee, before leaving his employment, may solicit his fellow employees to join him in a competing enterprise. However, the manner in which the solicitation may occur is limited. There is no breach of fiduciary duty where a managerial employee solicits another employee to join him in a competing venture, but there is no specific discussion of salaries or working conditions. *See James A. Head & Company v. Rolling*, 90 So. 2d 828, 839 (Ala. 1956) (no breach of fiduciary duty where a corporate director, and a managerial employee, advised another employee that they "were leaving and would like for him to come with them," but "[t]here was no talk of the amount of salary or working conditions"). Further, there is no breach of fiduciary duty when the departing employee is merely being receptive to an inquiry about the competing venture. *See id.* (Carl Bryson, a corporate director, did not breach his fiduciary duty given the following facts: as Bryson prepared to leave his employment, his secretary asked him whether she could follow him to the competing venture, and he replied that he "would make a place for her").

61

However, more aggressive steps may result in liability, as illustrated in *L.A. Draper & Son, Inc. v. Wheelabrator-Frye, Inc.*, 813 F.2d 332 (11th Cir. 1987). In that case, the Eleventh Circuit, applying Alabama law, found a jury question as to whether Fred Hester, a vice-president and corporate director, breached his fiduciary duty when he (i) invited an employee to join him in a new and competing venture, and (ii) advised the employee that, to join, the employee would be required to invest $20,000 in the business. *See id.* at 337 & n.4. The Eleventh Circuit specifically distinguished the Supreme Court of Alabama's decision in *Rolling* on the basis that the solicitations there were "more casual, and in one case instigated by the employee." *Id.* at 337.

Here, it is undisputed that Bill Kennard accepted an ownership interest in Civil Solutions on August 12, 2003. On that day or the next, while he was still on QORE's payroll, Kennard delivered a written offer of employment to Diana Lack. The letter was signed by Kennard in his capacity as a "Principal" of Civil Solutions, and it offered Lack a full-time engineering position. Lack was offered a salary of $2,036.48 biweekly, and fringe benefits were to include health, dental, life, and long-term disability insurance. Kennard did not hand in his notice of resignation to Brian Cook, his supervisor, until August 15.

Thus, while Bill Kennard was still a managerial employee of QORE, and

charged with the responsibility of supervising Diana Lack, he recruited her on behalf of a competing business with specific promises of salary and benefits. A reasonable jury could conclude from these facts that a breach of fiduciary duty occurred. *See L.A. Draper*, 813 F.2d at 337 & n.4; *see also Radiac Abrasives*, 532 N.E. 2d at 431 ("[I]f a defendant decides to go into business for himself and, while still employed by the plaintiff, contracts to employ the plaintiff's employees, he is in breach of his duties to plaintiff.") (citation omitted). Summary judgment will be denied.

### c.   Kennard's "marketing breakfast" with Daniel Osborn

A managerial employee, before leaving his employment, may not secretly solicit his employer's customers on behalf of a competing venture. *See Allied*, 585 So. 2d at 37 ("Implicit in this duty [of loyalty] is an obligation not to subvert the principal's business by luring away customers."). While that legal principle is undisputed, Bill Kennard contends that he never, in fact, lured or attempted to lure away any customers while he was still on QORE's payroll.

Bill Kennard and Brian Cook met for breakfast on either August 18 or 19, 2003, and during that meeting Cook asked Kennard to reconsider his decision to leave the company. Afterward, Kennard filled out an expense report dated August 23, 2003. Kennard wrote on the expense sheet that on August 18, he had participated in a "marketing breakfast" with Cook, and also Daniel Osborn of the Huntsville-based

firm Fuqua Osborn Architects.  Kennard testified that the inclusion of Osborn's name

on the expense report was in error.  In his words,

> Danny Osborn wasn't there.  That must be an error of some sort.  Brian
> Cook and I had gotten together that morning . . . . I am not sure why
> marketing breakfast was put down or why I put marketing breakfast.  I
> really don't know . . . . I believe that was the breakfast where Brian and
> I had gotten together and he had asked me to reconsider, and for
> whatever reason, I got the bill.[227]

While this testimony standing alone is unsatisfactory, defendants have

submitted the declaration of Daniel Osborn to corroborate Kennard's recollection of

the relevant events.  Osborn testified, "I did not have breakfast with Mr. Kennard and

Mr. Cook either individually or together on August 18, 2003 or at any other time."[228]

Osborn also testified that Kennard never told, suggested, or otherwise informed him

in advance that he would be changing employers, nor did Kennard ever ask, intimate,

or otherwise suggest that Fuqua Osborn Architects refrain from sending work to

QORE, so that the work could be sent instead to another business.[229]  Indeed, Osborn

observed that "[p]rior to Mr. Kennard leaving QORE he was actively attempting to

obtain geotechnical work for QORE."[230]

---

[227] Doc. no. 197, Kennard deposition, Vol. II, at 244-45.

[228] Doc. no. 142 (defendants' evidentiary submission), Ex. LL (Declaration of Daniel C.
Osborn), ¶ 7 at 2.

[229] *See id.*, ¶¶ 6 and 8 at 2.

[230] *Id.*, ¶ 5 at 2.

Given these facts, the court must conclude that there is insufficient evidence from which a reasonable jury could return a verdict in QORE's favor.  Kennard has explained that the reference to a "marketing breakfast" in his expense report was error.  That testimony is fully corroborated by Osborn's declaration.  Further, even if the court were to assume that a "marketing breakfast" between Kennard, Cook, and Osborn took place on August 18, 2003, there is no evidence that Kennard actually solicited business *on behalf of Civil Solutions* on that occasion.  Kennard's testimony is that, prior to leaving QORE, he never spoke to his clients about his upcoming departure,[231] and he continued to solicit business *on behalf of QORE*.[232]

Bill Kennard's motion for summary judgment on this aspect of the breach of fiduciary duty claim will be granted.

### d.    $300,000 of "held work"

QORE alleges that there were "some $300,000 in held work which Kennard lined up before he left, in plain breach of his fiduciary duty."[233]  A summary of the relevant evidence is helpful.

Jeff Mullins testified that he was eager to go into business with Bill Kennard

---

[231] *See* doc. no. 163 (plaintiff's evidentiary submission), Ex. 3, Kennard deposition, vol. 1, at 81-82.

[232] *See id.* at 94-95.

[233] Doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 54.

65

because, as of 2003, *Civil Solutions, LLP* had between $200,000 and $400,000 worth of business that needed to be allocated.  In the event that Kennard rejected Mullins' offer, Civil Solutions, LLP would have had to subcontract the work to another engineering firm, a practice which Mullins had grown tired of.

Jan Gill Wilkinson testified that she spoke to Diana Lack on at least two occasions on August 15, 2003.  Wilkinson recalled that:  (1) "She told me that Bill [Kennard] had been holding jobs that would keep them busy for about a year";[234] and (2) "She told me that Bill [Kennard] had held $300,000 worth of work, enough to do them for about a year and she said, 'This office is history.'"[235]  Wilkinson spoke to Lack again on August 20, 2003, and this time, she recalled as follows:  "Diana said that Bill was already on Civil Solutions payroll.  She said that they already had enough work that was being held to keep them busy for about a year or so, $300K or more."[236]

In rebuttal, Diana Lack testified that she "never said to Jan [Gill Wilkinson] that Bill [Kennard] had $300,000 worth of work lined up."  Rather, she "told Jan that Jeff [Mullins] had a backlog of $300,000."[237]

---

[234] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at 115.

[235] *Id.* at 219-220.

[236] Doc. no. 142 (defendants' evidentiary submission), Ex. HH.

[237] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 4, Lack deposition, at 87.

In his defense, Bill Kennard denies that he ever solicited any business for Civil Solutions while he was still on QORE's payroll.[238]  He also denies that he ever told Diana Lack that he was bringing $300,000 worth of work from QORE to Civil Solutions.[239]  As he recalled, "I wasn't bringing any work with me."[240]

Also relevant is the following deposition testimony of John Cutter, who was a marketing director at QORE's Huntsville office:

> Q.   During the summer of 2003, do you have any awareness of any work that was held back by Bill Kennard, Brian Cook, or Diana Lack?
>
> A.   No, sir.  I wouldn't see how we'd be able to hold the work back. We're not the ones that are, you know — do you understand what I am saying?
>
> Q.   No.  I think I am, but just help me understand.  First of all, who is "we"?
>
> A.   We're consultants, so we don't actually develop the projects, so there would be no work that we would hold back.
>
> Q.   So because of the nature of the business, you can't store it; is that correct?
>
> A.   *Unless you could persuade your client into doing it later.*[241]

---

[238] *See id.*, Vol. I, Ex. 3, Kennard deposition, vol. 1, at 94-95, 106.

[239] *See id.* at 106.

[240] *Id.*

[241] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 15, Cutter deposition, at 88-89 (emphasis supplied).

Following up on this last statement — "unless you could persuade your client into doing it later" — defendants have submitted the sworn declarations of representatives from more than a dozen businesses.[242]  It is undisputed that these entities retained the services of QORE's Huntsville office during the time period relevant to this suit.  The representatives consistently and independently declare that Bill Kennard, prior to his departure from QORE, never asked, suggested, or directed QORE's clients to refrain from sending any new or existing work to QORE so that, instead, the work could be sent to another business.  The representatives also consistently and independently declare that, up to the time of his departure, Kennard was actively soliciting new business *on behalf of QORE*.  QORE is unable to muster a response.  As defendants correctly observe:  "Not a single customer issued declarations in QORE's behalf."[243]

Where, as here, the party moving for summary judgment has discharged its initial burden to show that there are no genuine issues of material fact to be decided at trial, the opposing party must come forward with more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

---

[242]  *See* doc. no. 142 (defendants' evidentiary submission), Exs. II through WW.

[243]  Doc. no. 181 (Defendants' Reply), at 59.

Evidence that is "not significantly probative" will not create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The court finds that no reasonable jury, after reviewing all of the evidence, could rely on the mere scintilla of evidence provided by Jan Gill Wilkinson[244] to return a verdict in QORE's favor. The uncontroverted evidence is that, in order to "hold back" work, Bill Kennard would have been required to communicate with QORE's customers while he was still employed with the company, and persuade the customers to delay the commencement, continuation, or completion of a project. Yet, there is no evidence that such activity ever occurred. Jan Gill Wilkinson's testimony as to what Diana Lack told her cannot, and does not, fill these vital gaps in the record. The motion for summary judgment on this aspect of the breach of fiduciary duty

---

[244] The court will assume, for the sake of discussion, that the testimony of Ms. Wilkinson is even admissible at all. Plaintiff asserts that the evidence is non-hearsay, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. *See* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 101.

claim is due to be, and will be, granted.

### e.    Substandard work

In its second amended complaint, QORE alleged that Kennard breached his fiduciary duty "by neglecting his professional responsibilities to . . . ensure timely completion of projects in which he was involved, by allowing ongoing work to fall behind schedule, and by failing to keep files containing accurate schedule completion dates as agreed upon by the customer."[245]

Relevant testimony on these issues were provided by Charles Oligee, who replaced Brian Cook as the Branch Manager of the Huntsville office.   After Kennard's departure, QORE's employees inspected the work that had been performed under Kennard's supervision.   It was determined that there were problems with four projects in particular.  Oligee testified that, in August of 2003, Kennard recommended a design for a retaining wall (the "Broglan Branch" design), but the design was later determined to be inadequate.[246]   In August of 2003, Kennard made a subgrade stabilization recommendation (the "Gillespie Road" project) that was later rejected by the client.[247]   In August of 2003, Kennard made a subgrade stabilization recommendation (the "Western Area Outfall" project) that was later deemed to be

---

[245] Doc. no. 76 (Second Amended Complaint), ¶ 17 at 6.

[246] Doc. no. 163 (plaintiff's evidentiary submission), Ex. 1, Oligee deposition, at 117-23.

[247] *See id.* at 128-34.

inadequate.   (With regard to this project, it also was determined that there was additional work that was behind schedule.[248]) Finally, Kennard submitted a retaining wall design in June of 2003 (the "Meridian Street" design) that, according to Oligee, was plagiarized.[249]

Defendants did not challenge this component of the breach of fiduciary duty claim in their summary judgment briefs and, therefore, these issues will proceed to trial.

### 3.   Diana Lack

QORE asserts that Diana Lack breached her duty of loyalty to her employer when she downloaded confidential "job lists" and "client lists" from the QORE Information System on August 12, 2003.[250]  Although Lack denies that she ever downloaded the information, the court finds that a reasonable jury, after reviewing all of the evidence, could disagree.

The thornier question, however, is whether QORE may assert a duty of loyalty cause of action against Diana Lack.  Lack was not an officer or director of the company and, therefore, QORE may not rely on § 10-2B-8.42 of the Alabama Code to hold her liable.  The court also questions whether QORE may assert a cause of

---

[248] *See id.* at 134-37.

[249] *See id.* at 123-128.

[250] *See* doc. no. 76 (Second Amended Complaint), ¶ 18 at 6-7.

action under Alabama's common law.  Lack was not a managerial employee: she was a Professional Engineer who worked under the supervision of Bill Kennard, who in turn reported to Brian Cook.  There is no specific evidence that she was ever authorized by QORE to oversee, manage, or even use the company's "job lists" or "client lists."[251]

For now, the court will reserve judgment on this aspect of the motion for summary judgment.  The parties will be given an opportunity to brief, and squarely

---

[251] As one commentator observed:

The existence of a fiduciary duty is a question of law for the trial court.  In each Alabama case reviewed dealing with the right of an employee to enter into competition with his employer, the employee has functioned as either a sales person or a management level employee, both of which fit within the definition of "agent."

The law in Alabama is unclear in demonstrating whether lower-ranking employees who are not agents have similar fiduciary duties.  The Alabama Supreme Court has held that a special agent, "[a]n agent employed for a specific purpose," owes fiduciary duties to his principal only with regard to acts within the agency agreement.  From this, it logically follows that the scope of an employee's fiduciary duties equates with the scope of his agency.  If he is not authorized to act as an agent, he arguably has no fiduciary duties.

. . . .

Nonetheless, even non-agent employees owe a duty of loyalty — that is, honesty and fair dealing — to the employer.  *On the other hand, beyond providing a defense to an employee's action for wrongful discharge or unpaid compensation, it is unclear whether breach of that duty allows the employer an affirmative cause of action*.  Breach of the related duty of good faith does not allow the employer an affirmative cause of action.

McIlwain, *Backstab:  Competing with the Departing Employee*, 29 Cumb. L. Rev. at 621-22 (emphasis supplied) (internal footnotes and some markings omitted).

address, the core issue:  under Alabama law, may QORE affirmatively assert a duty

of loyalty cause of action against Diana Lack on the basis of the evidence set forth

here?

## B.    Fraudulent Suppression of Material Facts (Count V)

QORE contends that Brian Cook, Bill Kennard, and Diana Lack fraudulently

suppressed material facts which they had a duty to disclose, in violation of Ala. Code

§ 6-5-102 (1975) (1993 Replacement Volume), which provides:  "Suppression of a

material fact which the party is under an obligation to communicate constitutes fraud.

The obligation to communicate may arise from the confidential relations of the parties

or from the particular circumstances of the case."  The Supreme Court of Alabama

has interpreted this statute to require a plaintiff to establish four elements of a *prima*

*facie* case:  "(1) that the defendant had a duty to disclose a material fact; (2) that the

defendant concealed or failed to disclose that fact; (3) that the defendant's

concealment or failure to disclose that fact induced the plaintiff to act or to refrain

from acting; and (4) that the defendant's action resulted in harm to the plaintiff."

*Barnett v. Funding Plus of America, Inc.*, 740 So. 2d 1069, 1073 (Ala. 1999) (citing

*Booker v. United American Insurance Company*, 700 So. 2d 1333, 1339 n.10 (Ala.

1997)).

## 1.    Brian Cook

Brian Cook received a notice of resignation from Bill Kennard on Friday, August 15, 2003. Cook did not immediately disclose this information to Mack McCarley, or any other member of QORE's upper management. However, Jan Gill Wilkinson called McCarley on Sunday, August 17, and McCarley understood from this communication that Bill Kennard and Diana Lack were planning to leave the company, and that Cook also might leave. McCarley relayed this information to QORE President Dirk Van Reenan the following day, August 18.

Cook does not contest the first two elements of plaintiff's proof. The court will construe this as a concession that: Cook had a duty to disclose "material facts" to his employer, due to his positions as a vice president of the company and a Branch Manager; information regarding Bill Kennard's notice of resignation constituted a material fact; and Cook concealed or failed to disclose this fact. The court also finds that QORE may satisfy the third element of proof. A reasonable jury could conclude that, during the weekend between August 15 and August 18,[252] QORE was induced by Cook's silence to rely on the continued loyalty of Bill Kennard. *Cf. Alagold Corporation v. Freeman*, 20 F. Supp. 2d 1305, 1312 (M.D. Ala. 1998) (where corporate officer failed to disclose his intention to join a competing business, the non-

---

[252] It is important to note that by Monday, August 18, QORE's upper management was aware that Kennard and Lack were planning to leave QORE, and that Cook also might leave. It can not be said that, after this point, QORE was still relying on the continued loyalty of Bill Kennard, or Brian Cook and Diana Lack for that matter.

disclosure induced the employer "to rely on [the employee's] continued loyalty").

QORE's claim is nevertheless unavailing.  The fourth element of proof requires a plaintiff to demonstrate that it actually suffered a harm as a result of the defendant's action.  QORE asserts in its complaint that, due to Cook's suppression of material facts, Bill Kennard had an opportunity to "transfer at least $300,000 of revenues to Civil Solutions, Inc."[253]  This allegation rings hollow for reasons discussed in Part III(A)(2)(d) of this opinion *supra*.  QORE also asserts in its summary judgment brief that, but for Cook's suppression of material facts, the company would have "acted sooner to prevent its resulting losses."  QORE also complains that it "relied on the Defendants' continued loyalty to its obvious detriment."[254]  No evidence is cited, however, to illustrate what the "resulting losses" or "obvious" detriments were.  That omission is fatal.  As QORE is unable to satisfy the fourth element of its *prima facie* case, Brian Cook's motion for summary judgment is due to be, and will be, granted.

## 2.   Bill Kennard

Bill Kennard accepted an ownership interest in Civil Solutions, Inc. (24.5%) on August 12, 2003.  On this day or the next, Kennard delivered a written offer of employment to Diana Lack.  The offer letter was signed by Kennard in his capacity

---

[253] Doc. no. 76 (Second Amended Complaint), ¶ 24 at 11.
[254] Doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 60.

as a "Principal" of Civil Solutions.  Regional Manager Mack McCarley and President Dirk Van Reenan were aware, by August 17 and 18 respectively, that Kennard was planning to leave the company.

Bill Kennard does not dispute the first and second elements of plaintiff's proof. The court will construe this as a concession that:  Kennard, as a managerial employee, had a duty to disclose "material facts" to upper management; Kennard's acceptance of an ownership interest in Civil Solutions, Inc. constituted a material fact; and Kennard failed to disclose or concealed this fact.  The court also finds that QORE may satisfy the third element of proof.  A reasonable jury could conclude that, during the six-day period between August 12 and August 18,[255] QORE was induced by Kennard's silence to rely on his continued loyalty to the company.  *See Alagold*, 20 F. Supp. 2d at 1312.

QORE's claim is nevertheless unavailing, because QORE is unable to articulate how it actually suffered a harm as a result of Kennard's actions.  As QORE is unable to satisfy the fourth element of its *prima facie* case, Bill Kennard's motion for summary judgment is due to be, and will be, granted.

### 3.    Diana Lack

Construing the evidence in the light most favorable to the party opposing

---

[255] *See supra* note 252.

summary judgment, Diana Lack accepted an offer of employment with Civil Solutions on the evening of either August 12 or 13.  By way of Jan Gill Wilkinson, Regional Manager Mack McCarley and President Dirk Van Reenan became aware, by August 17 and 18 respectively, that Lack was planning to leave the company.

The court will assume without deciding that Diana Lack had a duty to disclose "material facts" to QORE's upper management,[256] and that her acceptance of employment with Civil Solutions constituted a material fact.  The court also finds that Diana Lack failed to disclose this fact to management, and accordingly, QORE was induced to rely on her continued loyalty from the time she accepted the offer of employment with Civil Solutions (August 12 or 13), to the time that McCarley and

---

[256] The Supreme Court of Alabama has explained that a duty to communicate may arise where "confidential relations *or 'particular circumstances'* exist." *Trio Broadcasters, Inc. v. Ward*, 495 So. 2d 621, 623 (Ala. 1986) (emphasis supplied).  Application of the "particular circumstances" prong necessarily entails a case-by-case analysis.  *See id.* at 624.

It is undisputed that Diana Lack was a professional engineer subject to the rules of ethics promulgated by the Alabama State Board of Licensure for Professional Engineers and Land Surveyors.  One provision requires a professional engineer, upon ascertaining a conflict of interest with her employer, to immediately disclose that conflict to the employer:

The engineer or his or land surveyor shall exercise independent judgments, decisions and practices on behalf of clients and employers as follows:

(a)  The engineer or land surveyor shall attempt to avoid all conflicts of interest with his client or employer, but when a conflict of interest is unavoidable, the engineer or land surveyor shall *immediately inform his or her employer* or client of any business association, interest, or circumstances which might tend to influence the licensee's professional judgments, decisions or practices or the quality of services.

Ala. Admin. Code r. 330-X-14.02(a) (emphasis supplied).

77

Van Reenan became aware of her plans to leave the company (August 17 and 18 respectively).

Even so, the decisive issue is whether QORE suffered any harm as a result of Diana Lack's actions. Again, QORE asserts in its summary judgment brief that, but for defendants' suppression of material facts, the company would have "acted sooner to prevent its resulting losses." QORE also complains that it "relied on the Defendants' continued loyalty to its obvious detriment."[257] No evidence is cited, however, to illustrate what the "resulting losses" or "obvious" detriments were. The motion for summary judgment filed by Diana Lack will be granted.

## C.   Interference with Contractual and Business Relations (Count IV)

To recover on a claim of tortious interference under Alabama law, a plaintiff must prove:  (1) the existence of a contractual or business relationship; (2) defendant's knowledge of such relationship; (3) intentional interference by defendant with the relationship; and (4) damages to plaintiff as a result of defendant's interference. *See Barber v. Business Products Center, Inc.*, 677 So. 2d 223, 227 (Ala. 1996); *Joe Cooper & Associates, Inc. v. Central Life Assurance Company*, 614 So. 2d 982, 986 (Ala. 1992). "Additionally, plaintiffs must produce substantial evidence of fraud, force, or coercion on the defendant's part." *Barber*, 677 So. 2d at 277.  *See*

---

[257] Doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 60.

*also Powell v. South Central Bell Telephone Company*, 361 So. 2d 103, 106 (Ala. 1978) (affirming dismissal of plaintiff's claim of intentional interference with employment relationship, because facts revealed no coercive, forceful, or unlawful conduct by defendant). Finally, justification is an affirmative defense, which must be pled and proved by the defendant. *See Gross v. Lowder Realty Better Homes and Gardens*, 494 So. 2d 590, 597 n.3 (Ala. 1986); 1 *Alabama Pattern Jury Instructions — Civil* 10.36, at 211-12 (2d ed. 1993).

QORE's contentions under this claim are two-fold. QORE asserts that Bill Kennard and others[258] tortiously interfered with the business relationships in place between QORE and its customers and, additionally, that Jeff Mullins and Richard Grace tortiously interfered with the contractual relationships in place between QORE and its former employees, Bill Kennard, Diana Lack, and Brian Cook.[259]

### 1.    QORE's Relationships with its Customers

The first two elements of the tortious interference claim are undisputed here. There were contractual and business relationships in place between QORE and its customers, and defendants had knowledge of such relationships. Even so, at the third element of proof, QORE must show that defendants intentionally interfered with

---

[258] QORE's complaint states that "defendants" are liable under this claim, without specifying which defendants. *See* doc. no. 76 (Second Amended Complaint), ¶ 22 at 9-10.

[259] *See id.*, ¶¶ 20-22 at 9-10.

these relationships.  It is unable to make this showing.

QORE directs the court to the following evidence as proof of intentional interference:  Bill Kennard conducted a "marketing breakfast" with Daniel Osborn of Fuqua & Osborn Architects on August 18, 2003; and, according to testimony of Jan Gill Wilkinson, Diana Lack told her that Bill Kennard was "holding back" $300,000 worth of business.[260]  For reasons discussed in Parts III(A)(2)(c) and (d) of this opinion, no reasonable jury could return a verdict in QORE's favor based upon this evidence.

QORE also observes that Bill Kennard, Brian Cook, and Diana Lack "began working with QORE clients almost immediately upon commencing work with Civil Solutions."[261]  This argument fails for two reasons.  Cook, Kennard, and Lack were each entitled, *immediately* upon leaving QORE, to compete with their former employer for the same business.  *See James A. Head & Company, Inc. v. Rolling*, 90 So. 2d 828, 840 (Ala. 1956).[262]  Additionally, a close examination of the evidence cited by QORE either exonerates the actions of defendants, or is insufficient to impose liability.[263]

---

[260] *See* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 61.

[261] *Id.*

[262] There is no evidence that any defendant signed a non-compete agreement with QORE.

[263] Three pieces of evidence cited by QORE merit some discussion.  Bill Kennard was asked to leave the Huntsville office of QORE on August 27, 2003.  Kennard began his employment with Civil Solutions the next day, August 28.  On that day, Kennard communicated with representatives

QORE also directs the court to the contents of the secretly recorded telephone conversation between Bill Kennard and Mary Hall.   Kennard placed the call sometime after he was terminated and, when describing his final confrontation with QORE's management, he said:

> [Kennard]:  I was accused of marketing work for them [Civil Solutions].
> I was accused of bringing work in for them and setting it up, you know.
> I was accused of representing myself as an employee of this new

---

from the following entities:  the City of Huntsville, Alabama; SKT Architects; Fuqua Osborn Architects; and, possibly Chapman Sisson Architects.  Kennard described these entities as "former clients," and he characterized the communications as "marketing."  Doc. no. 163 (plaintiff's evidentiary submission), Ex. 3, Kennard deposition, vol. 1, at 130-31.

There is no basis for liability on the basis of this evidence.  Once Kennard was fired, he was entitled to immediately compete with QORE for same business.

Also on August 28, Dale Payton of the Huntsville Times called the Huntsville office of QORE to speak to Kennard.  Payton learned from the person who answered the telephone that Kennard was no longer with the company.  Payton had no prior notice of Kennard's departure.

According to Payton, he then "called Mr. Kennard at home and learned that he would be part of a new venture."  Doc. no. 142 (defendants' evidentiary submission), Ex. KK, Declaration of Dale Payton, ¶ 4 at 1.  Kennard recalled, "Dale Payton with the Huntsville Times, he had actually called my house and gotten my wife's cell number and then called me.  And he wanted some testing services done.  That was it."  Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 3, Kennard deposition, vol. 1, at 134.  At some point, Payton asked Kennard to perform the work for the Huntsville Times.  *See* doc. no. 142 (defendants' evidentiary submission), Ex. KK, Declaration of Dale Payton, ¶ 8 at 2.

QORE complains that, prior to Kennard's departure, the Huntsville Times project had actually been awarded to QORE.  That evidence is disputed.  Regardless, even construing the evidence in the light most favorable to the party opposing summary judgment, there is no basis for liability.  Bill Kennard was offered business, and he accepted it.  QORE may not have liked Payton's decision to "switch" firms in order to follow Kennard's expertise, but such are the perils of competition.

Finally, Diana Lack testified that within a "week or two" of joining Civil Solutions, she assisted Brian Cook with a construction materials testing project that was "coming in at the time."  Doc. no. 163 (plaintiff's evidentiary submission), Ex. 4, Lack deposition, at 238.  Lack acknowledged that the work was being performed for Stanley Construction, which "had been a QORE client."  *Id.* at 239.  However, she did not know *when or how* Civil Solutions had acquired the project.  *See id.* at 240.  This evidence is insufficient to assess any liability against defendants.

company which is all true, um, not true, all a lie.

[Hall]: (Laughter)[264]

Kennard was asked about this portion of the recorded conversation during his deposition, and particularly the statement, "which is all true, um, not true, all a lie." Kennard characterized the comment as "accidental," while QORE's counsel suggested that the statement was made by Kennard in a "joking manner."[265]  Either way, the evidence is insufficient to prove that Kennard actually interfered with the business relationships in place between QORE and its customers.

Finally, QORE points to the deposition testimony of its Chief Financial Officer, Edward Heustess.  Heustess testified that he calculated the revenue generated by the geotechnical department of the Huntsville office, which Kennard supervised, in the "July/August time frame" of 2003.  He then calculated the revenue generated by the geotechnical department during the same time frame in 2002.[266]  Heustess testified that 2003 figure was "down significantly" from the 2002 figure.  Only somewhat more specifically, Heustess said "the revenue dipped by approximately one third."[267] Again, this evidence is insufficient to prove that defendants may be held liable for

---

[264] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 25, Hall deposition, at deposition exhibit 3.

[265] Doc. no. 197, Deposition of William Kennard, Vol. II, at 191-92.

[266] Doc. no. 163 (plaintiff's evidentiary submission), Ex. 12, Heustess deposition, at 170-71.

[267] *Id.*

tortious interference.  At the third element of proof, QORE must produce evidence that defendants intentionally interfered with the business relationships in place between QORE and its customers.  The fourth element requires a showing of damages as a result of that interference.  While the testimony proffered by Edward Heutess shows a decline in revenue, there is no evidence that any defendants intentionally interfered with QORE's business relationships, or that the relevant decline in revenue was caused by such interference.  Defendants' motions for summary judgment on this aspect of the claim will be granted.

**2.    QORE's contractual and business relationships with its employees**

There are three subparts to this component of the tortious interference claim. QORE asserts that:  (1) Jeff Mullins and Richard Grace tortiously interfered with QORE's relationship with Brian Cook, by offering him an ownership interest in a competing business while Cook was still employed with QORE; (2) Mullins and Grace tortiously interfered with QORE's relationship with Bill Kennard, by offering him an ownership interest in a competing business while Kennard was still employed with QORE; and (3) Grace, Mullins, and Kennard interfered with QORE's relationship with Diana Lack, by offering her a position with Civil Solutions while she was still employed with QORE.

A cause of action for tortious interference in the employer-employee context

is long-standing in Alabama law. *See Tennessee Coal, Iron & Railway Company v. Kelly*, 348 So. 1008, 1009-10 (Ala. 1909) (holding that when a third-party actor wrongfully or maliciously induces an employer to discharge an employee, the discharged employee may bring a tortious interference claim against the third party responsible for his injury); *Gross v. Lowder Realty Better Homes and Gardens*, 494 So. 2d 590, 594 (Ala. 1986) (reiterating *Tennessee Coal*).

Even so, the cause of action is limited, as explained by the Supreme Court of Alabama in *Defco, Inc. v. Decatur Cylinder, Inc.*, 595 So. 2d 1329 (Ala. 1992). An issue in *Defco* was whether a defendant could be held liable for hiring a competitor's at-will employee. *See id.* at 1331-32. The Court held that there could be no liability under the circumstance, absent a showing that the employee had an enforceable noncompetition agreement with his employer, or more vaguely, absent a showing that "defendant did more than simply hire its competitor's employee." *Id.* at 1332. *See also Alagold Corporation v. Freeman*, 20 F. Supp. 2d 1305, 1313 (M.D. Ala. 1998) (stating that, pursuant to *Defco*, "Alabama law [ ] does not recognize a claim for tortious interference with business or contractual relations for a defendant's hiring of a plaintiff's employees, absent a non-compete agreement between the plaintiff and its employees.").

Undoubtedly, *Defco's* holding paints QORE's position into a corner. It is

84

undisputed that Brian Cook, Bill Kennard, or Diana Lack were at-will employees. *See Udcoff v. Freidman*, 614 So. 2d 436, 438 (Ala. 1993) ("Without a clear and unequivocal offer of employment for a specific time or for the employee's lifetime, the contract is merely for at-will employment."). It also is undisputed that these defendants never entered into noncompetion agreements with QORE. Therefore, the general rule — that a defendant cannot be held liable for merely hiring a competitor's at-will employee — would seem to apply.

Even so, QORE suggests that Alabama courts, given the opportunity, would recognize yet another circumstance where liability may be assessed. Other jurisdictions have held that, where a defendant owes a fiduciary duty to his employer, but breaches that duty by inducing another employee to join a competing venture, the defendant may be held liable for tortious interference. *See* S. R. Shapiro, Annotation, *Liability for Inducing Employee not Engaged for Definite Term to Move to Competitor*, 24 A.L.R. 3d 821 (Westlaw through 2006) ("Among the theories which have been relied upon to sustain a defendant's liability for inducing an employee to move to a competitor have been the following . . . . that an employee was induced to leave by a person who had a fiduciary duty to the employer, and such person's conduct amounted to a breach of such fiduciary duty."). Assuming, for the sake of discussion, that Alabama courts may recognize such a theory of liability, the court

85

makes the following findings.

### a.   Offer of employment to Brian Cook

The first part of QORE's claim — that Jeff Mullins and Richard Grace tortiously interfered with the business and contractual relationship in place between QORE and Brian Cook — fails under any theory.  Mullins offered Cook a partnership interest in Civil Solutions, Inc., while Cook was still employed with QORE.  Mullins also intended to give Cook an ownership interest in Civil Solutions, Inc. (24.5%), although the record does not specify whether that information was ever communicated to Cook.  It also is undisputed that Mullins and Grace were partners in Civil Solutions, LLP, and that they conferred on all major decisions related to the company.

These facts do not establish any breach of fiduciary duty.  Mullins and Grace were entitled to make an offer of employment to Cook.  Cook was entitled to entertain the offer.  *Cf. Perfection Mattress & Springs Co. v. Dupree*, 113 So. 74, 78 (Ala. 1927) ("One is entitled to seek other employment before he is on the street.  The contrary would be a monstrous doctrine.").  Summary judgment will be granted on this aspect of the claim for tortious interference.

### b.   Offer of employment to Bill Kennard

The second part of QORE's claim — that Jeff Mullins and Richard Grace

tortiously interfered with the business and contractual relationship in place between QORE and Bill Kennard — also fails under any theory. QORE's contention has three parts: (i) Mullins and Grace induced Kennard to accept an ownership interest in Civil Solutions, Inc., on August 12, 2003; (ii) Kennard's acceptance of the ownership interest caused him to breach his fiduciary duty to QORE; and (iii) therefore, Mullins and Grace tortiously interfered with the relationship in place between Kennard and QORE.

However, for the reasons discussed in Part III(A)(2)(a) of this opinion *supra*, Kennard's acceptance of an ownership interest in Civil Solutions, Inc., did not, standing alone, result in a breach of fiduciary duty. This finding, which strikes at the heart of QORE's argument, requires that summary judgment on this aspect of the tortious interference claim be granted.

### c.    Offer of employment to Diana Lack

Bill Kennard breached his duty of loyalty to QORE when he offered employment to Diana Lack on August 12 or 13, 2003, on behalf of Civil Solutions, Inc. The reason for this conclusion was discussed in Part III(A)(2)(b) of this opinion *supra*.

Therefore, the decisive question is whether Alabama courts would follow other jurisdictions in recognizing a tortious interference cause of action under these

circumstances.  The court will reserve judgment on this aspect of the motion for summary judgment, and the parties will be given an opportunity to brief the issue.

## D.    Alabama Trade Secrets Act

The Alabama Trade Secrets Act, Alabama Code § 8-27-1 *et seq.* ("the Act"), "provides significant protection to trade secret owners, while drawing a fairly distinct line between that which is a trade secret and that which is not."  Ala. Code § 8-27-2 cmt. (1975) (2002 Replacement Volume).  The term "trade secret" is defined as "information that":

> a.    Is used or intended for use in a trade or business;
>
> b.    Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;
>
> c.    Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;
>
> d.    Cannot be readily ascertained or derived from publicly available information;
>
> e.    Is the subject of effort that are reasonable under the circumstances to maintain its secrecy; *and*
>
> f.    Has significant economic value.

Ala. Code § 8-27-2(1) (1975) (2002 Replacement Volume) (emphasis supplied). The Act further provides that:

> A person who discloses or uses the trade secret of another, without a

privilege to do so, is liable to the other for misappropriation of the trade secret if:

> (1)  That person discovered the trade secret by improper means;

> (2)  That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;

> (3)  That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2), above; or

> (4)  That person learned the information and knew or should have known that it was a trade secret and that its disclosure was made to that person by mistake.

Ala. Code § 8-27-3.  Therefore, in order to succeed on its claim that defendants violated the Act, QORE must prove that (i) defendants acquired a "trade secret" from plaintiff, and (ii) that the conditions for proving liability, as set out in § 8-27-3, are met.

The backbone of QORE's contention is that on August 12, 2003, a "client list" and a "job list" were downloaded from the QORE Information System and onto the hard drive of the work computer assigned to Diana Lack.  The files were put into electronic spreadsheets, and then converted into a "zip" format, which permits the transfer of large volumes of electronic information.

89

### 1.    QORE's client list

The client list was stored on the QORE Information System ("QIS").  The list identified the names of QORE's clients, their representatives, and the client contact information, and information dated back to January of 1998.  In order to access the list through QIS, an employee had to first log on to a Microsoft server using an individual password, and then log on to the QIS database using a separate password. Diana Lack, Bill Kennard, and Brian Cook each received an employee handbook which specified that "[a]ll information concerning the services performed for clients is considered confidential."[268]  The court finds that a genuine issue of material fact exists as to whether the client list constituted a "trade secret" under Ala. Code § 8-27-2(1).

Even so, in order to show liability, QORE must prove that Diana Lack, or another defendant, actually *disclosed* or *used* the client list.  QORE again relies on the following testimony of Jan Gill Wilkinson:  "She [Diana Lack] told me that Bill [Kennard] had held $300,000 worth of work."[269]  QORE reasons from this evidence that "[o]bviously, in order to be 'holding back' such business, Defendant Kennard must have been in possession of customer names, contact information . . . and other

---

[268] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 7, Affidavit of Jan Gill Wilkinson, ¶ 7 at 3, and affidavit exhibits 1 through 4 (filed under seal).

[269] *Id.*, Vol. II, Ex. 8, Wilkinson deposition, at 219-220.

financial and client specific information that would permit him to 'hold' or maintain that business while keeping it away from QORE."[270]

What QORE is asking a reasonable jury to conclude, therefore, is that (i) after Diana Lack retrieved the client list from the QORE Information System, (ii) she disclosed the list to Bill Kennard, (iii) who then used the list, sometime during the three-day period between August 12 and August 15, 2003,[271] (iv) to solicit $300,000 worth of business on behalf of Civil Solutions, Inc.

There is insufficient evidence upon which a reasonable jury could make these multiple inferences. A reasonable jury could certainly conclude that *Diana Lack* downloaded the client list from the QORE Information System on August 12, 2003. However, there is no evidence that *Bill Kennard*, who purportedly "held back" the $300,000 in business, ever received the client list from Diana Lack. Indeed, Kennard testified that if Lack retrieved a client list from the QORE Information System, he was never aware of it.[272] There also is insufficient evidence upon which a reasonable jury could conclude that Bill Kennard actually "held back" $300,000 worth of business, let alone all in the three-day period between August 12 and 15. The

---

[270] Doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 79.

[271] The client list was downloaded on August 12. Three days later, on August 15, Diana Lack allegedly said to Jan Gill Wilkinson, "Bill [Kennard] had held $300,000 worth of work, enough to do them for about a year." *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at 219-220.

[272] *See* doc. no. 197, Kennard deposition, Vol. II, at 183-90.

reasoning for this final conclusion was set forth in Part III(A)(2)(d) of this opinion *supra*.  Summary judgment will be granted on this aspect of the trade secrets claim.

## 2.    QORE's job lists

The "job list" also was stored on the QORE Information System.  The list identified the projects that the company had performed, dating back to January 1998. The list specified the name of the project, where the project was performed, the "job date," the name of the client, and the client representative.  In order to access the job list through the QIS, an employee had to first log on to the Microsoft server using a password, and then log on to the QIS database using a separate password.  Diana Lack, Bill Kennard, and Brian Cook each received an employee handbook which specified that "[a]ll information concerning the services performed for clients is considered confidential."[273]  The court finds, as a preliminary matter, that a genuine issue of material fact exists as to whether the job list constituted a "trade secret" under Ala. Code § 8-27-2(1).

Even so, QORE must still prove that defendants actually *disclosed* or *used* the list in order to establish liability under the Act.  On this issue, QORE relies on the circumstantial evidence summarized below.

Of the thousands of entries on the job list, one was for a Sam's Wholesale

---

[273] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 7, Affidavit of Jan Gill Wilkinson, ¶ 7 at 3, and affidavit exhibits 1 through 4 (filed under seal).

Center located on University Drive, Huntsville, Alabama.  The full entry identified the job number ("8039"), the "job name" ("CEI/SAMS/UNIVERSITY DRIVE"), where the project was to be performed ("UNIVERSITY DRIVE (WEST OF RIDEOUT ROAD"), the "job date," ("11/2/00"), the client "contact" ("STUART RAYBURN"), the client's name ("CEI") and the client address ("TWO INTERNATIONAL PLAZA," "SUITE 300," "NASHVILLE, TN").[274]  Similar entries also were included for the following jobs:  "LOWES HIGHWAY 72," performed in Madison, Alabama, with the "job date" of February 10, 1998;[275] "RESEARCH PARK OFFICE CENTER" ("phases" I, II, and III), performed for a client located in Huntsville, Alabama, with "job dates" in 1998 and 1999;[276] "SATURN V — USSRC," performed for a client located in Huntsville, Alabama, with "job dates" in 1999;[277] and a "BABY'S [sic] R US," performed on "HWY 72 @ TARGET COMPLEX," with a "job date" of August 1, 2001.[278]  It is undisputed that either Bill Kennard or Brian Cook, or both, worked on each of these projects.

After Cook and Kennard departed QORE, they began to solicit business on

---

[274] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 7, Affidavit of Jan Gill Wilkinson, Ex. 6 (job list) at page 14 of 110 (filed under seal).

[275] *See id.* at page 54 of 110.

[276] *See id.* at 47 of 110.

[277] *See id.* at 96 of 110.

[278] *See id.* at 108 of 110.  U.S. Highway 72 is an east-west highway that runs through Northern Alabama.

behalf of Geo Solutions, LLC.  Kennard submitted a proposal letter to Tony Repucci, General Manager of Regal Auto Plaza, on October 23, 2003.[279]  The letter was related to the construction of a proposed Mercedes dealership in Huntsville.  Kennard's letter set forth a recommended scope of engineering services, as well as a proposed schedule and fees.  The proposal letter also stated the qualifications of the Geo Solutions "principals" as follows:

## Qualifications

The principals of GEO Solutions have been involved in a majority of the major projects in the Huntsville/Madison area in the past 10 years.  A sampling of a few recent projects we have been involved with in the immediate site vicinity include, the following:

- Providence Community
- DC Park Retail Development, Interior Roadways
- Best Western Hotel, DC Park
- Residence Inn, West Park Center
- *Babys-R-Us, Target Center*
- First Commercial Bank Office Building
- *Sams Club, University Drive*
- Miltec Office Building, Cummings Research Park
- Logans Roadhouse, DC Park
- Carmike Cinema Complex, Old Monrovia Pike
- *Lowes, U.S. Highway 72 West*
- Bradford Office Center, Research Park Boulevard
- New Western Area High School, Cummings Research Park[280]

---

[279] Doc. no. 180 (defendants' supplemental evidentiary submission), Ex. B.

[280] *Id.* at pages 1-2 of proposal letter.

Kennard and Cook also sent a proposal letter to Brett Thorton of O&S Holdings on or about March 17, 2004.[281]  O&S Holdings was, and is, involved with the development of the "Bridge Street Town Centre" in Cummings Research Park, a science and research center located in Huntsville.  In the letter, Cook and Kennard proposed that Geo Solutions perform the geotechnical engineering services related to the development.  Among other matters, the letter set forth the qualification of the Geo Solutions "principals":

<u>**Qualifications**</u>

The principals of GEO Solutions have been involved in numerous major projects in the Huntsville/Madison area in the past 10 years.  Further, GEO Solutions principals have extensive experience in Cummings Research Park.  A few of the recent projects we have been involved with in the immediate site vicinity include the following:

- *Saturn V Replica, US Space and Rocket Center*
- SCI Diamond Avenue Plants
- First Commercial Bank Office Building
- *Sams Club, University Drive*
- Miltec Office Building, Cummings Research Park
- Aegis Office Building, Cummings Research Park
- Mevatec Facilities, Voyager Way, Cummings Research Park
- *Research Park Office Center, Phases 1 thru 4*
- Bradford Office Center, Cummings Research Park
- CRS Office Building, Voyager Way, Cummings Research Park
- New Western Area High School, Cummings Research Park
- Providence Community

---

[281] Doc. no. 180 (defendants' supplemental evidentiary submission), Ex. A.

- DC Park Retail Development, Interior Roadways
- Best Western Hotel, DC Park
- Residence Inn, West Park Center
- Providence Community, Providence Main Street[282]

Cook and Kennard followed up with another proposal letter to O&S Holdings, dated June 1, 2004, which restated the same "Qualifications."[283]

The significance of the foregoing evidence is not readily apparent. QORE contends that "at least some" of the information that appeared on its job list also appeared in the Geo Solutions letters sent to Regal Autoplaza and O&S Holdings.[284] For example, the following projects appeared on QORE's job list, and also were cited in the "Qualifications" sections of the letters of proposal submitted by Geo Solutions: "Sam's Club, University Drive"; "Bab[ies] R Us, Target Center"; "Lowes, U.S. Highway 72 West"; "Saturn V Replica, US Space and Rocket Center"; and, "Research Park Office Center." The court also will assume that an additional project — "Carmike Cinema Complex, Old Monrovia Pike" — appeared on both the job list and the statement of "Qualifications" included in the Geo Solutions proposals.[285]

From this evidence, a reasonable jury is asked to conclude that (i) Diana Lack

---

[282] Doc. no. 180 (defendants' supplemental evidentiary submission), Ex. A, at pages 1-2 of proposal letter.

[283] *See* doc. no. 142 (defendant's evidentiary submission), Vol. II, Ex. GG.

[284] Doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 79.

[285] QORE's summary judgment brief asserts that the "Carmike Cinema" project appeared on both. *See* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 80. The court could not locate the Carmike Cinema projects on the job list, which is thousands of entries long.

downloaded the job list from the QIS on August 12, 2003, (ii) she then disclosed the

job list to Brian Cook and/or Bill Kennard, (iii) either Cook or Kennard, or both, used

the job list to remember what projects they had been involved with, dating back to

1998, and (iv) upon refreshing their recollection, Cook or Kennard, or both, listed the

projects as part of their "qualifications" in the proposal letters submitted to Regal

Autoplaza and O&S Holdings.

There is insufficient evidence upon which a reasonable jury could make these

multiple inferences.  Indeed, the whole of the argument rests on nothing more than

a belief, held by two members of QORE's management, that neither Bill Kennard nor

Brian Cook could have remembered their past work experience several years in the

distance.  As Charles Oligee testified in his capacity as QORE's representative:

> A.    "I believe they were assisted, and their possession of that [job] list
> facilitated their ability to recall these projects.
>
> Q.    What evidence do you have that Mr. Kennard and Mr. Cook are
> unable to remember on their own the projects that they worked on
> near this — near or in the Cummings Research Park?
>
> A.    I believe that it is difficult to recall projects three and four years
> after they're completed.[286]

Edward Heustess also testified, in his capacity as a QORE representative, as follows:

> Q.    And I take it that you don't have a problem with your former

---

[286] Doc. no. 163 (plaintiff's evidentiary submission), Ex. 1, Oligee deposition, vol. 1, at 79-
80.

employees correctly stating and factually correctly stating the projects on which they have worked before?

A.     If they are not using our job history list, no, sir.

Q.     So if they're using their own memory to do this, it's okay with you; is that right?

A.     Yes, sir.

Q.     What evidence do you have that Mr. Kennard didn't use his own memory when he put the Sam's Club on University Drive in this list of about a dozen projects?

A.     I believe the age of it, November of 2000.

Q.     So you don't think that Mr. Kennard could remember a project three years earlier?

A.     I don't believe he did.

Q.     Why is it that you don't . . . believe that Mr. Kennard would remember a project that he did three years before?

A.     I just believe he used the jobs history list.

Q.     Yes, sir.  I understand that's your conclusion.  I'm trying to understand why it is you believe Mr. Kennard would suddenly have developed amnesia about the projects that he performed in the year 2000.

          MR. GAMBLE:  Object to the form of the question.

          MR. TANKERSLEY:  The question stands.

A.     I'm not saying he doesn't have amnesia.  I'm saying you're not

going to remember every job you worked on.[287]

The court finds that the evidence, in toto, is insufficient to survive summary judgment. It is *possible* that Brian Cook and Bill Kennard could not remember their past work experience. It is *possible* that Diana Lack disclosed the "job list" to Cook or Kennard, or both. It is *possible* that Cook and Kennard relied on the list to refresh their recollection. It is *possible* that Cook and Kennard then completed the statement of "Qualifications" in the Geo Solutions proposal letters, with the benefit of their refreshed memory. While none of these conclusions are beyond the realm of possibility, that is not the standard by which a reasonable juror can return a verdict in QORE's favor. Evidence that is "merely colorable," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), conjectural, or "not significantly probative," *Anderson*, 477 U.S. at 249, will not create a "genuine" issue of material fact. Summary judgment on this aspect of the trade secrets claim is due to be, and will be, granted.[288]

---

[287] *Id.*, Vol. III, Ex. 12, Heustess deposition, at 119-20.

[288] Finally, perhaps as a last effort, QORE asserts that defendants did not discharge their initial burden at summary judgment and, therefore, the burden never shifted to QORE to come forward with any evidence. It is true that the party asking for summary judgment always bears the initial responsibility of informing the court, by reference to materials on file, that there are no genuine issues of material fact to be decided at trial. *See, e.g., Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party can discharge this burden, however, by "showing" or "pointing out" to the court that there is *an absence of evidence* to support the non-moving party's

### E.   Conversion

A conversion claim under Alabama law may be one of four types.   "To establish conversion, a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, *or* a wrongful detention or interference with another's property."   *Coleman v. Higginbotham*, 861 So. 2d 1080, 1085 (Ala. 2003) (citations omitted) (emphasis deleted and added).   *See also, e.g., National Surety Corporation v. Applied Systems, Inc.*, 418 So. 2d 847, 849 (Ala. 1982) ("To constitute conversion, there must be a wrongful taking *or* a wrongful detention or interference, *or* an illegal assumption of ownership, *or* an illegal use or misuse.") (citing *Ott v. Fox*, 362 So. 2d 836 (Ala. 1978) (emphasis added).   The fourth basis for an action of conversion — wrongful detention — requires proof that "the plaintiff demanded the return of the converted property and that the defendant refused that return."   *Applied Systems*, 418 So. 2d at 849 (citation omitted).   *See also generally* Michael L. Roberts and Gregory S. Cusimano, *Alabama Tort Law* § 29.04 (4th ed. 2004).

While conversion is an intentional tort, "[t]he intent required is not necessarily a matter of conscious wrongdoing.   It is rather an intent to exercise a dominion or

---

case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (Rule 56 permits the moving party to discharge its initial burden with or without supporting affidavits.).  That is what defendants have done here.

control over the goods which is in fact inconsistent with the plaintiff's rights." *Johnson v. Northpointe Apartments*, 744 So. 2d 899, 904 (Ala. 1999) (citation and internal marking omitted).  *See also Gardner v. State Farm Mutual Automobile Insurance Company*, 842 So. 2d 1, 7 (Ala. Civ. App. 2002) ("Under Alabama law, conversion consists of an act or omission by defendant with intent to assert control over property of the plaintiff.") (emphasis deleted) (citing *Martin v. Luckie & Forney, Inc.*, 549 So. 2d 18 (Ala.1989)).

QORE asserts that the following items were converted by defendants during the time period relevant to this litigation:  (1) the architectural plans related to the project for the Huntsville *Times*; (2) the client file and job file located on the QORE Information System; (3) a toolbox; (4) a resistivity meter manual; (5) QORE's Health and Safety Manual; and (6) a QORE "statement of qualifications" which had been prepared for the purpose of soliciting business from O&S Holdings, LLC.[289]

### 1.    Architectural plans for the Huntsville *Times* project

The evidentiary basis of this claim, construed in the light most favorable to the party opposing summary judgment, is summarized in the following paragraphs. QORE was awarded a project from the Huntsville *Times* sometime before August 27, 2003, when Bill Kennard and Brian Cook were asked to leave the company.  It is

---

[289] *See* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 91-94.

undisputed that QORE obtained certain "drawings" from an architectural firm for the purposes of completing the project.  Kennard began working for Civil Solutions on August 28.  On that day, Dale Payton of the Huntsville *Times* called QORE's Huntsville office to speak to Kennard, but he was advised by the person who answered the telephone that Kennard was no longer with the company.  Payton did not have any advance notice that Kennard was changing employers.  Payton then ascertained Kennard's personal contact information, and communicated with him the same day.  The Huntsville *Times* project was awarded to Kennard, rather than to QORE, sometime during or following this conversation.

On August 28, the same day that Dale Payton and Bill Kennard were communicating, Diana Lack told Regional Manager Mack McCarley that she too would be leaving the company.  As Lack cleaned out her office, she was observed by Whitney Cox, an administrative employee, who testified: "I saw Diana Lack packing up items in her office, including books, notebooks, and looseleaf binders.  I saw Diana Lack leave the office with these items and *a set of rolled-up papers that looked like plans or drawings*."[290]

At some point, a representative from the Huntsville *Times* telephoned QORE's Huntsville office.  As Charles Oligee, who replaced Brian Cook as Branch Manager

---

[290] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 23, Affidavit of Whitney Cox, ¶ 6 at 2.

of the Huntsville office, explained,

> It is my understanding that the client called us and indicated that we
> were no longer working on that project.  In an effort to try and address
> why he made that decision, we attempted to locate the drawings [related
> to the project].[291]

Cox testified that she, Jan Gill Wilkinson, and Mary Hall "searched the entire office"

for the Huntsville *Times* drawings but were unable to locate them.[292]

Meanwhile, Bill Kennard performed the engineering services related to the

Huntsville *Times* project.  Dale Payton testified that Bill Kennard did not arrive on

the job site with any plans at his disposal:  "Indeed, Mr. Kennard had to use the

contractor's plans while on the site."[293]

The Huntsville *Times* drawings then reappeared in QORE's Huntsville office.

As Cox recalled,

> In approximately late October or early November of 2003 the
> Huntsville *Times* drawings reappeared in our office in a prominent place
> in Bill Kennard's office.  Bill Kennard's office had been thoroughly
> searched in late August of 2003 when the plans were initially discovered
> missing . . . .[294]

Oligee testified:  "I inquired with anyone who had any knowledge of being in that

---

[291] *Id.*, Vol. I, Ex. 1, Oligee deposition, at 107-08.

[292] *Id.*, Vol. III, Ex. 23, Affidavit of Whitney Cox, ¶ 8 at 3.

[293] Doc. no. 142 (defendants' evidentiary submission), Ex. KK, ¶ 8 at 2.

[294] Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 23, Affidavit of Whitney
Cox, ¶ 8 at 2.

office, anyone who had been near the office, anyone who had been seen going in and out of that office, and no one . . . . No one was aware of how they returned."[295]

On the basis of the foregoing evidence, QORE seeks to impose liability on either Diana Lack, Bill Kennard, or both, for conversion of the Huntsville *Times* drawings. The court finds, however, that the totality of the evidence is insufficient to pass summary judgment review. The most probative evidence is that Diana Lack, on her last day at QORE, was observed leaving the office with "a set of rolled-up papers that looked like plans or drawings." Even so, this evidence only invites speculation as to what those "plans or drawing" actually were. The fact that the architectural drawings ultimately reappeared in the old office of Bill Kennard is not any more probative. The drawings could have just as easily been placed there by a person who is not a party to this action, as by one of the defendants. Summary judgment will be granted on this aspect of the conversion claim.

### 2.    Client list and job list

On August 12, 2003, a client list and a job list were downloaded from the QORE Information System, onto the hard drive of the work computer assigned to Diana Lack, and the lists were put into spreadsheets and converted into a "zip" format. A month later, on September 11, 2003, QORE's legal counsel sent

---

[295] *Id.*, Vol. I, Ex. 1, Oligee deposition, at 199.

correspondence to Diana Lack, specifically demanding the return of any job lists or client lists in her possession.  There is no evidence that the job list or the client list were ever returned.

To the extent that QORE asserts a claim of "wrongful *use*" of the client list and the job list by defendants, the motions for summary judgment will be granted.  The court's reasoning for this decision is set forth in Part III(D) of this opinion *supra*.  Otherwise, the motion for summary judgment filed by Diana Lack will be denied.

### 3.    Toolbox and resistivity meter manual

On September 11, 2003, Diana Lack received a letter from QORE's counsel demanding the return of any and all items belonging to QORE.  Construing the evidence in the light most favorable to the party opposing summary judgment, Brian Cook and Bill Kennard received a similar demand letter on September 15, 2003.  Even so, no items were immediately returned.

After the commencement of this lawsuit, QORE propounded a request for production of all property of QORE in the possession, custody, or control of defendants.  In response, defendants collectively returned a toolbox and a resistivity meter manual on December 10, 2003.  To the extent that defendants move for summary judgment with regard to these items, the motions will be denied.

### 4.    Health and Safety Manual

Defendants also returned a copy of QORE's Health and Safety Manual on December 10, 2003, in response to QORE's formal discovery request. The Health and Safety Manual was authored by QORE, and it outlined the company's policy for health and safety in its everyday operations.

To the extent that QORE asserts a claim for "wrongful *use*" of the Health and Safety Manual by defendants, the motions for summary judgment will be granted. There is no evidence to support this type of conversion.[296]   Otherwise, summary judgment will be denied.

### 5.     QORE's "Statement of Qualifications" for O&S Holdings

---

[296] Charles Oligee, in his capacity as OQRE's corporate representative, explained that the maintenance of a company health and safety plan is sometimes a prerequisite for obtaining work from certain clients. *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 1, Oligee deposition, at 94-96.

There is no evidence, however, that defendants ever used QORE's Health and Safety Manual to assist them in acquiring any business. Edward Heustess, in his capacity as QORE's corporate representative, testified: "I don't know if the health and safety manual was used [by defendants] in obtaining business or not." Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 12, Heustess deposition, at 113. Oligee testified:

Q.     Okay. What evidence do you have that the defendants have made use of the QORE Health and Safety Program?

A.     It was in their possession.

Q.     Anything else other than that?

A.     I believe that substantiates it.

*Id.*, Vol. I, Ex. 1, Oligee deposition, at 98. Of course, defendants' mere "possession" of the Health and Safety Manual does not constitute "use" of the manual for purpose of soliciting business from clients.

Defendants also returned a "Statement of Qualifications" on December 10, 2003, in response to QORE's formal discovery request. The Statement of Qualifications had been prepared by QORE, for the purpose of soliciting business from O&S Holdings, LLC. O&S Holdings was, and is, involved with the development of residential and commercial space in Huntsville, Alabama. The Statement of Qualifications had been signed by Brian Cook, and it was dated January 17, 2003. To put that date in perspective, January 17 was more than seven months prior to Brian Cook's termination. Among other matters, the document presented an overview of QORE's organization, the personnel at QORE's Huntsville branch, and the staff's prior work experience.

To the extent that QORE asserts a claim of "wrongful *use*" of the Statement of Qualifications by defendants, for the purpose of soliciting business from O&S Holdings, defendants' motions for summary judgment will be granted. There is no competent evidence to support this type of conversion.[297] Summary judgment

---

[297] QORE states in its brief that "Defendants also used the QORE O&S Holdings statement to help prepare bids for jobs," doc. no. 76, Ex. A (Plaintiff's Revised Brief), at 93, but no evidence is cited in support of that proposition. Indeed, in his capacity as QORE's corporate representative, Edward Heustess all but conceded that there was no evidence:

    A.    There was a statement of qualifications for O&S Holdings that was taken and returned to us in December of '03 . . . .

          . . . .

    Q.    What use was made of this statement of qualifications by the corporate and

otherwise will be denied.

## F.      Conspiracy (Count VI)

"Under Alabama law, a conspiracy is a combination to accomplish an unlawful

end or to accomplish a lawful end by unlawful means."  *Alagold Corporation v.*

*Freeman*, 20 F. Supp. 2d 1305, 1314 (M.D. Ala. 1998) (citing *Scott v. Commonwealth*

*Land Title Insurance Company*, 518 So. 2d 102 (Ala. 1987)).   Absent proof of an

underlying wrong — in this case, an underlying tort — a conspiracy claim must fail

as a matter of law.   *See Allied Supply Company, Inc. v. Brown*, 585 So. 2d 33, 36

(Ala. 1991) ("If the underlying cause of action is not viable, the conspiracy claim

must also fail."); *O'Dell v. State*, 117 So. 2d 164, 168 (Ala. 1959) ("Where civil

liability for conspiracy is sought to be enforced, the conspiracy itself furnishes no

_____

| | individual Defendants relative to O&S Holdings? |
|---|---|
| A. | I believe they used the statement of qualifications to help them prepare to obtain the O&S business. |
| Q. | Have you questioned anybody at O&S about that? |
| A. | No, sir. |
| | . . . . |
| Q. | Who told you that the QORE statement of qualifications had been used by the Defendants to get work from O&S Holdings? |
| A. | *That's an assumption.* |

Doc. no. 163 (plaintiff's evidentiary submission), Vol. III, Ex. 12, Heustess deposition, at 115-17 (emphasis supplied).

cause of action.  The gist of the action is not the conspiracy alleged but the wrong

committed.").

An individual who is involved in a conspiracy may be liable even if he does not

actually commit the overt acts in furtherance of the conspiracy.  That is because a

person "'who is present, encouraging, aiding, abetting, or assisting, or who is ready

to aid, abet, or assist the other in the perpetration or commission of the offense,'" is

equally liable.  *Huckleberry v. Dixon Lumber Company, Inc.*, 503 So. 2d 1209, 1211

(Ala. 1987) (quoting *Stokley v. State*, 49 So. 2d 284, 291 (Ala. 1950)).  The Supreme

Court of Alabama has further stated:

> We acknowledge that a great quantum of detail may not be
> required to prove the formation of a conspiracy, and that because of its
> secretive nature proof of a conspiracy must often be inferentially and
> circumstantially derived from the character of the act done, *O'Dell v.
> State*, 270 Ala. 236, 117 So.2d 164 (1959), but a plaintiff is not relieved
> of the burden of supplying at least sufficient evidence from which the
> factfinder can infer that a conspiracy existed.  *See, e.g., Turner v.
> Peoples Bank of Pell City*, 378 So.2d 706 (Ala.1979).  "It is only by
> looking to the conduct of the alleged conspirators during the progress of
> the conspiracy and the end result achieved that usually such a fact [a
> conspiracy] is established." *National Distillers & Chemical Corp. v.
> American Laubscher Corp.*, 338 So.2d 1269, 1272 (Ala.1976), quoting
> *Barber v. Stephenson*, 260 Ala. 151, 69 So.2d 251 (1954).

*Scott v. Commonwealth Land Title Insurance Company*, 518 So. 2d 102, 104 (Ala.

1987).

Here, QORE's conspiracy claim adds a gloss to all of the underlying torts

asserted in its complaint:   *i.e.*, the allegation is that "defendants" are liable for conspiracy to breach fiduciary duties, suppress material facts, interfere with contractual and business relations, misappropriate trade secrets, and convert property belonging to QORE.[298]   QORE makes no attempt to narrow these issues.

Many individual aspects of QORE's conspiracy claim must fail, as a matter of law, because there is insufficient proof of an underlying tort.   Indeed, only the following subparts to the following claims have so far survived summary judgment:

- ■   Brian Cook breached his fiduciary duty to QORE when he failed to advise upper management that, on August 15, 2003, he had received a notice of resignation from Bill Kennard;

- ■   Bill Kennard breached his fiduciary duty to QORE when he gave Diana Lack a written offer of employment, on either August 12 or 13, 2003, on behalf of Civil Solutions;[299]

- ■   Bill Kennard breached his fiduciary duty to QORE when he allegedly performed substandard work on the following projects: the Broglan Branch design; the Gillespie Road project; the Western Area Outfall project; and, the Meridian Street design;

- ■   Diana Lack converted property belonging to QORE when she allegedly downloaded the client list and the job list from the QORE Information System and converted them into "zip" files for

---

[298] *See* doc. no. 76 (Second Amended Complaint), ¶¶ 26-28 at 12-13.  *See also* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 101.

[299] As discussed in Part III(C)(2)(c) of this opinion, the court reserves judgment as to whether, based upon these same facts, QORE may bring a cause of action against Bill Kennard, Jeff Mullins, and Richard Grace for tortious interference with the business and contractual relationship in place between QORE and Diana Lack.

transmission;[300] and,

■    Brian Cook, Bill Kennard, or Diana Lack, or all three, converted the following items belonging to QORE:  a toolbox; the resistivity meter manual; the Health and Safety Manual; and, QORE's Statement of Qualification prepared for O&S Holdings.

The discussion of QORE's conspiracy claim will be limited to these alleged, underlying torts.

### 1.    Cook's failure to advise upper management of Kennard's notice of resignation

Brian Cook received a written notice of resignation from Bill Kennard on August 15, 2003.  Cook testified that after he received the notice, he immediately asked Kennard to reconsider his decision.  Cook recalled that Kennard seemed "open to talking," although admittedly, Kennard was not giving out "any warm fuzzies."[301] Cook testified that afterward, he *alone* made the decision to keep the resignation letter a secret.[302]   According to Cook, he believed that if news of Kennard's resignation was made known to others, his chances of retaining Kennard's services for QORE would diminish.[303]

However, Cook's testimony is contradicted by other evidence in the record.

---

[300] As discussed in Part III(A)(3) of this opinion, the court reserves judgment as whether, based upon these same facts, QORE may bring a cause of action against Diana Lack for breach of the duty of loyalty.

[301] Doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 2, Cook deposition, at 36.

[302] *See id.* at 70-73.

[303] *See id.*

111

Diana Lack and Jan Gill Wilkinson communicated on several occasions during the relevant time period, and on one occasion, Wilkinson recorded the following conversation:

JAN [Gill Wilkinson]:  What's the word?

DIANA [Lack]:  Well there's one last thing to agree upon.  Do you wanna know what the last thing was to agree upon?

JAN:  Probably money.

DIANA:  No, who was going to be the office manager.  Brian [Cook] said absolutely not.  Bill [Kennard] was not going to be manager . . . .

. . . .

JAN:  Yeah.  So, did Brian tell him that he was going to turn in his resignation . . . .

DIANA:  Well, I guess the whole thing with Brian, if you think about it, um, this last issue [about who would be manager].  And um, to make his decision [about whether he, too, would leave QORE].

JAN:  Why can't they be partners in crime, I mean.

DIANA:  Supposedly Bill will leave that Friday and probably like that Saturday or Sunday we will get together the people that they want to take at either Brian or Bill's house.  Tell everybody what is going on and give everybody the opportunity to ask their questions, do their thing, I don't

JAN:  Yeah, but is that safe.

DIANA:  *Well, Bill, I because I asked Bill how are [they] planning on*

*transitioning the people and stuff like that.  He said not to worry about um [b]ecause once he leaves, corporate is going to know that something is going on.*

JAN:  *Who, Bill?*

DIANA:  *Bill.*

JAN:  *So that's the reason why Brian didn't turn in his resignation because Brian doesn't want them to know and ask questions.*

DIANA:  *Right.  And because of stepping in before everything is said and done.  The the [sic] reason why Brian wants me left here is because corporate is more likely to leave him alone right away because there is a PE [Professional Engineer] on staff.*[304]

Based on the foregoing, a reasonable jury could conclude that Brian Cook and Bill Kennard *together* planned to keep Kennard's notice of resignation a secret from upper management.  A reasonable jury also could conclude that Diana Lack was ready to aid, abet, or assist the others in keeping Kennard's resignation a secret from upper management.  The motions for summary judgment filed by Brian Cook, Bill Kennard, and Diana Lack on this aspect of the conspiracy claim will be denied.

However, to the extent that QORE seeks to assert a conspiracy claim against Jeff Mullins or Richard Grace on the basis of the same facts, the motion for summary judgment filed by these defendants will be granted.  QORE does not cite, and the court could not locate, any evidence that Mullins or Grace were even aware of Cook's

---

[304] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at deposition exhibit 22 (emphasis supplied).

decision to keep Kennard's notice of resignation a secret.

### 2.    The August 12 or 13, 2003 offer of employment to Diana Lack

Bill Kennard handed a written offer of employment to Diana Lack on August 12 or 13, 2003.  The offer was signed by Kennard, and also by Jeff Mullins, in each individual's capacity as a "Principal" of Civil Solutions, Inc.  Richard Grace did not sign the letter, but construing the evidence in the light most favorable to the party opposing summary judgment, he was aware of, and approved, the decision to extend the offer.  Upon review of this evidence, a reasonable jury could conclude that Kennard, Mullins, and Grace acted together to extend an offer of employment to Diana Lack on August 12 or 13.  The motions for summary judgment filed by these defendants will be denied.

Even so, the motion for summary judgment filed by Brian Cook will be granted.  There is no evidence that Cook was involved in the plan to lure away Diana Lack on August 12 or 13.

### 3.    Substandard work

QORE asserts that Bill Kennard performed substandard work on the following: the Broglan Branch design; the Gillespie Road project; the Western Area Outfall project; and, the Meridian Street design.  However, QORE does not cite, and the court could not locate, any evidence that Kennard cooperated with any other defendant to

114

perform the substandard work complained of.  The motions for summary judgment will be granted on this aspect of the conspiracy claim.

### 4. Downloading the job list and client list from the QORE Information System

QORE contends that Diana Lack downloaded the job list and the client list from the QORE Information System on August 12, 2003, and that she conspired with Bill Kennard to do so.  There is no direct evidence to support this claim.  Instead, construing the evidence in the light most favorable to the party opposing summary judgment, the court must consider the following circumstantial evidence.  Bill Kennard told Diana Lack on August 8, 2003, that he was planning to leave QORE to go into business with Jeff Mullins.  Lack immediately communicated to Kennard that she would follow him to his new place of employment.  The jobs list and the client list were then downloaded from the work computer assigned to Diana Lack on August 12.  The same day, Bill Kennard accepted his offer of employment with Civil Solutions, Inc., and on that day or the next (August 12 or 13), he gave Diana Lack a written offer of employment with Civil Solutions.  Lack accepted the offer the same day she received it.  By the end of the month, both Bill Kennard and Diana Lack were working for Civil Solutions.

"The essence of a conspiracy is an agreement, a meeting of the minds between

the conspirators." *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 327 (Ala. Civ. App. 1996) (citing *Eidson v. Olin Corporation*, 527 So. 2d 1283 (Ala. 1988)). "The plaintiff must allege and prove that the claimed conspirators had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy." *Florey*, 676 So. 2d at 327. Here, a reasonable jury is asked to infer from the relationship of Bill Kennard and Diana Lack, and the temporal proximity of events, that Kennard had actual knowledge of, and the intent to bring about, the unlawful acquisition of confidential databases from the QORE Information System.

The parties do not cite, and the court could not find, any Alabama decision that is factually on all fours with this case. However, this court concludes that the evidence presented in this case merely creates the *suspicion* that Diana Lack downloaded confidential information by way of agreement with Bill Kennard. Mere suspicion, even in the context of conspiracy, is insufficient to pass summary judgment review. *See Florey*, 676 So. 2d at 328 ("Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement [between conspirators] must be sufficient to create more than suspicion or conjecture in order to justify submission to a jury.") (citation omitted) (brackets in original). The motion for summary judgment filed by Bill Kennard will be granted as to this aspect of the

116

conspiracy claim.[305]

## 5.    Items returned during discovery

Brian Cook, Bill Kennard, and Diana Lack collectively returned the following items to QORE in response to its formal discovery request:  (i) a resisitivity meter manual, (ii) a Health and Safety Manual, (iii) a toolbox, and (iv) a "Statement of Qualifications" signed by Cook, during his employment with QORE, which was prepared for the purpose of soliciting business from O&S Holdings, LLC.

The record does not specify which defendants were in possession of which item, or how the defendants came to be in possession of each item.  There is no evidence of a conspiracy here.  The motions for summary judgment filed by Cook, Kennard, and Lack will be granted as to this aspect of the conspiracy claim.

## G.    Corporate Structures (Count VII)[306]

---

[305] QORE does not cite, and the court could not locate, any evidence that Jeff Mullins, Richard Grace, or Brian Cook were involved in a conspiracy with Lack to download the job and client lists from the QORE Information System.  To the extent that QORE intended to assert a conspiracy claim against these defendants on this issue, the claim will be dismissed.

[306] The number and variety of business entities involved in this litigation are many.  A summary is provided in the paragraphs below.

Civil Solutions, LLP was formed in 1999 by Jeff Mullins and Richard Grace, who owned and operated the limited liability partnership through entities established for that purpose, Jeff W. Mullins, P.C. and Grace Group, P.C.  Four years later, in 2003, Mullins, Grace, and Bill Kennard agreed that another entity would be formed, Civil Solutions, Inc., for the purpose of providing geotechnical engineering services to Civil Solutions, LLP.  It was anticipated that Civil Solutions, Inc. would be in competition with QORE.  The incorporation papers for Civil Solutions, Inc. were filed on August 14, 2003.

Brian Cook and Bill Kennard were asked to leave QORE on August 27, 2003, and Diana Lack voluntarily left the company on August 28.  Threats of litigation immediately followed.

Count Seven asserts that Geo Solutions, LLC ("the LLC") was formed by the individual defendants in September of 2003 for the purpose of: "(1) continuing Defendants' wrongful and tortious conduct toward QORE, (2) continuing to benefit from their previous wrongful conduct, and (3) creating a sham corporation to protect them from liability to QORE for their wrongful conduct."[307]   The complaint also asserts that the four "members" of the LLC — Grace Group, P.C., Jeff W. Mullins, P.C., W. Kennard, Inc., and Brian Cook, Inc. — were merely "alter egos" of the individual defendants.[308]

## 1.   Limited Liability Company Act

The court must first address defendants' contention that the four members of Geo Solutions LLC cannot, as a matter of law, be parties to this action.[309]   That

QORE's counsel sent a letter to Richard Grace, in his capacity as a registered agent of Civil Solutions, Inc., on August 29.   Grace was advised that QORE was investigating the events surrounding the departures of Cook, Kennard, and Lack, and that a lawsuit would be filed if necessary.   Other correspondence from QORE's counsel followed on September 11 and 15, 2003.

Meanwhile, also in early of September 2003, Mullins, Grace, Kennard, and Cook abandoned the concept of doing business through Civil Solutions, *Inc.*   Instead, it was agreed that a new entity would be formed, and it would do business under the name "Geo Solutions."   The Articles of Organization for Geo Solutions, LLC were filed on September 17, 2003, and the document specified that the entity was comprised of four members:   Grace Group, P.C.; Jeff W. Mullins, P.C.; W. Kennard, Inc.; and, Brian Cook, Inc.   Brian Cook formed Brian Cook, Inc. on September 18, 2003, a day after the Articles of Organization for Geo Solutions were filed.   Bill Kennard formed W. Kennard, Inc., sometime during this period.

Kennard, Cook, and Lack were placed on the payroll of Geo Solutions, LLC in February of 2004 — *i.e.*, approximately six months after the LLC was formed.

[307] *See* doc. no. 76 (Second Amended Complaint), ¶ 31 at 14.

[308] *See id.*, ¶¶ 32-35 at 14-15.

[309] Doc. no. 143 (Defendants' Amended Brief), at 40-41.

118

argument is grounded in the Limited Liability Company Act, Ala. Code § 10-12-1 *et seq.* (the "Act").

It is undisputed that Grace Group, P.C., Jeff W. Mullins, P.C., W. Kennard, Inc., and Brian Cook, Inc., qualify as "members" of Geo Solutions, LLC under the Act. *See* Ala. Code § 10-12-2(j) (1975) (1999 Replacement Volume) (defining a "member" of a limited liability company as a "person reflected in the required records of a limited liability company as the owner of some governance rights of a membership interest in the limited liability company").

As a general rule, it also is true that members of an LLC are not proper parties to proceedings against the LLC, and members are not liable for judgments against the LLC. *See Filo America, Inc. v. Olhoss Trading Company, LLC*, 321 F. Supp. 2d 1266, 1268 (M.D. Ala. 2004) (Thompson, J.). These limitations are expressly set forth in two provisions of the Act, §§ 10-12-18 and 10-12-20.[310]

---

[310] Section 10-12-18 states:

> Neither a member nor a manager of a limited liability company is a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's or manager's rights against or liability to the limited liability company.

Ala. Code § 10-12-18 (1999). Section 10-12-20 adds, in relevant part, as follows:

> Except as otherwise provided in this chapter, a member of a limited liability company is not liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise, or for the acts or omissions of any other member,

While the plain language of §§ 10-12-18 and 10-12-20 would seem to warrant the dismissal of the LLC members from this case, there is additional, persuasive authority on the issue. In *Filo America*, the plaintiff sued a limited liability company and its two members alleging claims under Alabama law. The court's jurisdiction was based upon diversity of citizenship. *See Filo America*, 321 F. Supp. 2d at 1267. *See also* 28 U.S.C. § 1332. On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the two members of the LLC asserted, like the defendants in this case, that the Act prohibits suits from being brought against members of an LLC. *See id.* at 1268.

The Court first observed that, under Alabama law, a court may sometimes disregard a corporate entity, or "pierce the corporate veil," and impose liability directly on the stockholders or owners of a corporation. *See id.* The decisive question was whether the "veil" of an LLC could be pierced in an analogous manner, to impose liability directly on the individual members of the LLC. The *Filo America* Court could not locate a relevant decision from Alabama courts.[311] However, after review of authority from other jurisdictions, as well as pertinent law reviews, the Court concluded that it was possible to "pierce the veil" of an LLC under Alabama

---

manager, agent, or employee of the limited liability company.

Ala. Code § 10-12-20(a) (1999).

[311] This court also is unable to locate a relevant Alabama decision.

law.  *See id.* at 1268-69.  This extraordinary remedy would be particularly warranted where there was a fraudulent purpose in the conception or operation of the LLC.  *See id.* at 1270.

This court is persuaded by the well-reasoned decision of Judge Thompson in *Filo America*, and agrees that the "veil" of a limited liability company may be "pierced," in order to impose liability directly on the individual members of an LLC.[312]  *See also Gilbert v. James Russell Motors, Inc.*, 812 So. 2d 1269, 1273 (Ala. Civ. App. 2001) (the concept of corporate "piercing" is an equitable doctrine based on common law).  Therefore, to the extent that the four members of Geo Solutions, LLC seek summary judgment on the basis of §§ 10-12-18 and 10-12-20 of the Act, the motion will be denied.  These defendants are not automatically dismissed on the basis that they are "members" of a limited liability corporation.

## 2.    Piercing the veil

Next, it is important to note that QORE seeks to pierce the veils of a number of business entities in this case.  At the first step, QORE seeks to pierce the veil of Geo Solutions, LLC, in order to hold the four members of the LLC directly liable for the actions of the company.  Of course, assuming that it is successful, QORE is

---

[312] This court reiterates the sentiment, expressed by Judge Thompson in *Filo America*, that the court is making only an educated guess as to how the Supreme Court of Alabama would rule on the issue.

immediately faced with another challenge, as the four members of Geo Solutions, LLC are themselves incorporated entities — Grace Group, P.C., Jeff W. Mullins, P.C., W. Kennard, Inc., and Brian Cook, Inc.  Therefore, QORE also seeks to pierce the veil of each of these entities, in order to reach Richard Grace, Jeff Mullins, Bill Kennard, and Brian Cook, and hold each individually liable.

It is well-settled in Alabama that a corporation is a separate and distinct entity from its shareholders, directors, or officers.  *See, e.g., Simmons v. Clark Equipment Credit Corporation*, 554 So. 2d 398, 400 (Ala. 1989); *Alorna Coat Corporation v. Behr*, 408 So. 2d 496, 498 (Ala. 1981). A corporation also is separate and distinct from any other corporate entity that may control it.  *See First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334-35 (Ala. 1991).  Therefore, as a general rule, the "corporate structure is intended to protect shareholders and officers [and others] from liability arising from the operation of the corporation."  *Gilbert v. James Russell Motors, Inc.*, 812 So. 2d 1269, 1273 (Ala. Civ. App. 2001) (citation omitted).  *See also Wright v. Alan Mills, Inc.*, 567 So. 2d 1318, 1319 (Ala. 1990) (stating that "a corporation's obligations and transactions are to be considered separately from those of the corporation's stockholders"); *M&M Wholesale Florist, Inc. v. Emmons*, 600 So. 2d 998, 999 (Ala. 1992) (stating that "limited liability is one of the principal purposes for which the law has created the corporation") (citation omitted).

Even so, the court may sometimes disregard the corporate form and assess liability directly against the controlling persons or entities.  This practice, commonly referred to as "piercing the corporate veil," is "not a power that is lightly exercised." *Backus v. Watson*, 619 So. 2d 1342, 1345 (Ala. 1993).  Within the exceptional cases, however, three factors are commonly used as justification for "piercing the corporate veil."  They are:  (1) "inadequacy of capital"; (2) "fraudulent purpose in conception or operation of the business"; or (3) "operation of the corporation as an instrumentality or alter ego."  *Culp v. Economy Mobile Homes, Inc*, 895 So. 2d 857, 859-60 (Ala. 2004).  *See also Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987) (same).

### a.    Geo Solutions, LLC

QORE seeks to pierce the veil of Geo Solutions, LLC on the basis that it was "set up solely for the purpose of Defendants' avoiding their individual liabilities to QORE."[313]  QORE thus relies on the second justification stated above for piercing the veil of Geo Solutions, LLC.

It is undisputed that Bill Kennard, Jeff Mullins, and Richard Grace originally intended to do business through an entity called Civil Solutions, *Inc.*  Even so, within days of receiving word that QORE threatened to file this lawsuit, these defendants

---

[313] Doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 110.

123

(plus Brian Cook) decided to create, and do business through, Geo Solutions, LLC instead.  Indeed, Geo Solutions, LLC was so hastily created that Cook and Kennard did not actually begin to draw their salaries and benefits from Geo Solutions, LLC until approximately six months later, in February of 2004.  This evidence certainly emits more than just a whiff of foul play.

An important and fundamental issue nevertheless remains unaddressed.  The organization papers for Geo Solutions, LLC were filed on September 17, 2003, three weeks after Cook, Kennard, and Lack departed QORE.  Arguably, by this point, Brian Cook and Bill Kennard had already breached their fiduciary duties to their employer, and Cook, Kennard, and Diana Lack had already converted items belonging to QORE.  If that were the case, the creation of Geo Solutions, LLC would have made no difference at all to the individual defendants, in terms of seeking shelter from this suit.  A corporation formed *after* the commission of a tort cannot retroactively shield a defendant from liability.[314]

QORE's summary judgment brief repeatedly asserts that Geo Solutions, LLC was created by defendants for the purpose of "avoiding personal liability," but it fails to articulate what liability was being avoided.  However, the court will reserve

---

[314] In the second amended complaint, events which occurred after the formation of Geo Solutions, LLC *were* a basis for certain claims asserted by plaintiff.  For example, it was alleged that the individual defendants, through Geo Solutions, LLC, unlawfully used QORE's trade secrets in soliciting business from O&S Holdings.  That and other claims have been dismissed, however.

judgment on this issue, and the parties will be given the opportunity to brief the

following question:   what liability, if any, could the individual defendants have

avoided by way of organizing Geo Solutions, LLC on September 17, 2003?

> **b.    Grace Group, P.C., Jeff W. Mullins, P.C., W. Kennard, Inc., and Brian Cook, Inc.**

The court's concerns come into even sharper focus with regard to the members

of the LLC.  QORE contends that piercing the corporate veils of Grace Group, P.C.,

Jeff W. Mullins, P.C., W. Kennard, Inc., and Brian Cook, Inc. is proper under the

"alter ego" theory.[315]  In *Messick*, the Supreme Court of Alabama gave guidance on

this particular justification for piercing the corporate veil, saying,

> In an attempt to circumvent some of the difficulties in applying conclusory terms such as "instrumentality," "alter ego" and "adjunct," we announced, in *Kwick Set Components, Inc. v. Davidson Ind., Inc.*, 411 So.2d 134 (Ala.1982), a standard to be applied in order to determine whether the corporate entity should be disregarded when excessive control is the ground.  While acknowledging that the dominating party may be an individual or another corporation, we stated the elements essential for imposition of liability on the dominant party as follows:

> 1)  The dominant party must have complete control and domination of the subservient corporation's finances, policy and business practices so that at the time of the attacked transaction the subservient corporation had no separate mind, will, or existence of its own;

> 2)   The control must have been misused by the dominant party. Although fraud or the violation of a statutory or other positive legal duty is misuse of control, when it is necessary to prevent injustice or

---

[315] *See* doc. no. 173, Ex. A (Plaintiff's Revised Brief), at 111-12.

inequitable circumstances, misuse of control will be presumed;

3)  The misuse of this control must proximately cause the harm or unjust loss complained of.

*Messick*, 514 So. 2d at 894-95 (emphasis supplied) (citation omitted).  *See also First Health*, 585 So. 2d at 1334-35 (reiterating the elements set forth in *Messick*).

In its summary judgment brief, QORE devotes itself to demonstrating how Brian Cook, Bill Kennard, Richard Grace, and Jeff Mullins exercised complete control over their respective corporations.  However, there is  no discussion of how the control was misused by each individual defendant, or how the misuse of this control proximately caused a harm or unjust loss.  The parties will be given an opportunity to brief the issue of whether, based upon the evidence in the record, all elements of the "alter ego" theory may be satisfied.

## H.    Damages

Defendants move for summary judgment on each component of the $1.7 million in damages sought by QORE in this litigation.[316]  The court is quite certain that several aspects of the motion are due to be denied as moot, in light of partial summary judgment being granted on the underlying claims.  However, the court would like additional input from the parties on this issue.  For now, the court will reserve judgment on defendants' motion, and the parties will be given the opportunity

---

[316] *See* doc. no. 143 (Defendants' Amended Brief), at 41-49.

to brief the following question:  in light of partial summary judgment being granted on the underlying claims, which components of the total damages asserted by QORE are now moot?

## I.    Federal Rule of Civil Procedure 56(d)

In the event that summary judgment were not granted on all claims, the Geo Solutions defendants moved the court to issue an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy.  *See* Fed. R. Civ. P. 56(d).  An appropriate order will be entered upon the court's full resolution of defendants' motions for summary judgment.

## IV.  QORE'S MOTION FOR SUMMARY JUDGMENT

## A.    Brian Cook's Federal Counterclaim[317]

Title 18, United States Code, Section 2511(1) "prohibits the interception, disclosure, or use of any wire or electronic communication."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).  The statute provides, in pertinent part, that

> any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . . [or] intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the

---

[317] As discussed in Part II of this opinion, the federal counterclaims asserted by Bill Kennard and Diana Lack were earlier dismissed without prejudice.

> information was obtained through the interception of a wire, oral, or
> electronic communication in violation of this subsection . . . . shall be
> subject to suit as provided . . . .

18 U.S.C. § 2511(1).

Many of the terms used in § 2511(1) are defined in 18 U.S.C. § 2510.  A

telephone conversation, for example, qualifies as a "wire communication" under 18

U.S.C. § 2510(1).[318]  *See Briggs v. American Air Filter Company, Inc.*, 630 F.2d 414,

417 (5th Cir. 1980)[319] ("A telephone conversation is a wire communication.")

(citations omitted).  "Intercept" means "the aural or other acquisition of the contents

of any wire, electronic, or oral communication through the use of any electronic,

mechanical, or other device."  18 U.S.C. § 2510(4).[320]  *See also Epps v. St. Mary's*

---

[318] Section 2510(1) specifically defines "wire communication" as:

> any aural transfer made in whole or in part through the use of facilities for the
> transmission of communications by the aid of wire, cable, or other like connection
> between the point of origin and the point of reception (including the use of such
> connection in a switching station) furnished or operated by any person engaged in
> providing or operating such facilities for the transmission of interstate or foreign
> communications or communications affecting interstate or foreign commerce[.]

18 U.S.C. § 2510(1).

[319] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down
prior to the close of business on September 30, 1981.

[320] An "electrical, mechanical, or other device," in turn, is given a detailed definition in 18
U.S.C. § 2510(5).  The provision states:

> **(5)** "electronic, mechanical, or other device" means any device or apparatus
> which can be used to intercept a wire, oral, or electronic communication other than
> —

*Hospital of Athens, Inc.*, 802 F.2d 412, 415 (11th Cir. 1986) (holding that, where a telephone call was received through a telephone console and recorded by a double-reeled tape recorder, the console, and not the recorder, "intercepted" the call). Additionally, a "person" is defined broadly, as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation."  18 U.S.C. § 2510(6).

"A civil remedy is provided under 18 U.S.C. § 2520 in favor of any person whose wire or oral communication is intercepted, disclosed, or used in violation of 18 U.S.C. § 2511(1)." *Epps*, 802 F.2d at 414.  Section 2520 provides in relevant part as follows:

> [A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the

> **(a)** any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business; or (ii) being used by a provider of wire or electronic communication service in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties;

> **(b)** a hearing aid or similar device being used to correct subnormal hearing to not better than normal[.]

18 U.S.C. § 2510(5).

United States, which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a).

The evidentiary basis of Brian Cook's counterclaim is the deposition testimony of Mary Hall, who was Bill Kennard's secretary. Construing the evidence in the light most favorable to the party opposing summary judgment, Mary Hall observed Jan Gill Wilkinson eavesdropping on telephone conversations at the office, by using an "intercom" button located on her telephone unit. This practice began after Wilkinson learned that Bill Kennard and Diana Lack were planning to leave the company. Wilkinson also used a small device to record the conversations that were audible over her telephone headset. On one occasion, Wilkinson gave the device to Mary Hall so that she could listen. Wilkinson told Mary Hall that the speaker was Brian Cook and, upon listening to the recording, Hall indeed recognized his voice.

Cutting straight to the chase, the court will assume that Brian Cook may assert a § 2511(1) violation *against Jan Gill Wilkinson*, and pursue civil remedies against her pursuant to § 2520(a). Even so, that is of little consolation to Cook because Jan Gill Wilkinson is *not* a party to this action — QORE is.

In light of this fact, Cook asserts that Wilkinson's conduct was ultimately ratified by QORE's management and, therefore, liability may be assessed directly

130

against the corporate entity.[321]   This court disagrees.   As a threshold matter,

defendants do not cite, and the court could not locate, a case where § 2520(a) liability

was assessed against a corporation on the basis that the eavesdropping practices of

an employee were "ratified."   However, even assuming that such a theory may apply,

Cook's argument is unavailing on the merits.

The Restatement of Agency defines "ratification" as follows:  "the affirmance

by a person of a prior act which did not bind him but which was done or professedly

done on his account, whereby the act, as to some or all persons, is given effect as if

originally authorized by him."   *Restatement (Second) of Agency* § 82 (1958).

"Affirmance," in turn, is defined as follows:  "a manifestation of an election by one

on whose account an unauthorized act has been done to treat the act as authorized";

or "conduct by him justifiable only if there were such an election."   *Id.* at § 83.  Of

course, an employer's knowledge of the employee's act is a critical element of

ratification.  An employer cannot "ratify" an act if he is unaware of it.  *See Busby v.*

---

[321] *See* doc. no. 160 (Defendants' Response to Plaintiff's Memorandum), at 20.  Cook also suggests, briefly, that QORE's management gave Wilkinson implicit authority to intercept Cook's telephone communication, or disclose the contents thereof.  *See id.* at 14 (saying, "[t]here can be little doubt that Gill had a 'wink and a nod' from QORE upper management to surveil Cook . . . by all available means.").   Cook, however, abandons this notion later in his brief.  *See id.* at 20 (Cook acknowledges QORE's argument that QORE's management did not give Wilkinson the authority to intercept or disclose Cook's telephone conversation, but instead of addressing the issue, Cook turns instead to QORE's purported *ratification* of Wilkinson's action).   *See also id.* at 25 (reemphasizing that it is under the theory of *ratification* that Cook seeks to assess liability against QORE).

*Truswal Systems Corporation*, 551 So. 2d 322, 327-28 (Ala. 1989); *Potts v. BE&K Construction Company*, 604 So. 2d 398, 400 (Ala. 1992).

Here, it is undisputed that QORE's management had knowledge of *some* of Jan Gill Wilkinson's investigative activities. Regional Manager Mack McCarley learned on Sunday, August 17, 2003, that Wilkinson had entered the office of Brian Cook and retrieved, from one of his office drawers, the letter of resignation that had been turned in by Bill Kennard.[322]  McCarley also knew that Wilkinson had secretly recorded an August 20 conversation with Diana Lack, *of which Wilkinson was a party*.  QORE's management arguably ratified both of these actions.  In response to defendants' motions for summary judgment, QORE has submitted into evidence a transcribed copy of the August 20 recording.  Defendants also point out that, in the spring of 2004, Wilkinson was awarded a substantial bonus for her work performance in 2003.[323]  The bonus check was personally delivered to Wilkinson by Mack McCarley, who purportedly told her, "We appreciate all of your hard work . . . . All of your continued hard work."[324]  Defendants also note that Wilkinson's son was hired by

---

[322] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at 134.

[323] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at 29-30; doc. no. 184 (plaintiff's evidentiary submission in response to defendants' response to QORE's motion for summary judgment), Ex. J-HP, "highly protected" deposition of Charles Oligee and deposition exhibit 1.  (Filed Under Seal).

[324] Doc. no. 163 (plaintiff's evidentiary submission), Vol. II, Ex. 8, Wilkinson deposition, at 30-31.

QORE sometime in spring or early summer of 2004.[325]

However, the sum of this evidence does not squarely addresses the issue before the court:  did QORE's management know, and affirm, the decision of Jan Gill Wilkinson to secretly *eavesdrop* on Brian Cook's *telephone* conversations at the office, or on any other telephone conversations for that matter?

There is no evidence that Mary Hall reported Wilkinson's behavior to her supervisors.   There also is insufficient evidence to conclude that QORE's management learned of the practice by word of mouth.[326]   Indeed, this lawsuit was

---

[325] *See id.* at 13.

[326] Defendants direct the court to the deposition testimony of April St. John, who was an administrative employee at the Huntsville office during the relevant time period.  Ms. St. John testified that it was "common knowledge" that Wilkinson eavesdropped on telephone calls at the office.  Doc. no. 184 (plaintiff's evidentiary submission in response to defendants' response to QORE's motion for summary judgment), Ex. L, Deposition of April St. John, at 35.  St. John clarified her testimony, however, as follows:  "I mean, I know I keep saying common knowledge, but really it seemed to be common knowledge, *especially among us girls that were pretty close*, it seemed to be common knowledge that [eavesdropping] was going on after the fact."  *Id.* at 38 (emphasis supplied).  St. John also testified:

> Q.     Is it fair to say that there was — now, you this, I'm just rephrasing it.  There was a common knowledge at QORE that eavesdropping and recording of conversations was going on?
>
>        MR. BROOKS:  Object to the form.
>
> A.     Yes, to some level, I mean, everyone in QORE may not have had knowledge of that, but there was *certain people that were, you know, that talked on a daily basis* and that there was *a certain group of us girls* that, you know, that would probably have access to this information more so than somebody that, you know, we weren't that close to or whatever.  But, yeah, there was kind of a common knowledge that, yeah, some of that [eavesdropping] had gone on between a small group of girls.

filed in October of 2003, and the deposition of Mary Hall was taken over ten months later in August 2004. After Mary Hall's deposition was completed, Charles Oligee, who succeeded Brian Cook as Branch Manager of the Huntsville office, reviewed the transcript. Oligee testified that he immediately initiated an investigation to determine whether Halls' allegations of Wilkinson's eavesdropping practices were true.[327] When Oligee asked Wilkinson about the matter, she told him that Hall's allegations against her were false.[328] There is no evidence that Oligee had an opportunity to speak to Mary Hall, because by the time of these events, Hall had voluntarily left the company and was with a new employer.[329] Oligee testified that *had* Wilkinson been found guilty of eavesdropping on telephone conversations at the office, she would have been reprimanded, and any future bonuses would have been reduced.[330]

Upon review of this evidence, the court cannot conclude that QORE's management knew, and affirmed, Wilkinson's act of eavesdropping on Brian Cook's

---

*Id.* at 42-43.

   Later in her deposition, St. John was asked to specify who the "group of girls" were. St. John testified that the group consisted of herself, Whitney Cox, Mary Hall, and Jan Gill Wilkinson. *See id.* at 63-64, 84, 89, 108, 119. All were administrative employees at the Huntsville office.

   St. John further testified that, at some point, these conversations occurred so often that they "spread . . . to other people in the office." *Id.* at 116. However, St. John did not specify who the "other people in the office" were.

[327] *See* doc. no. 163 (plaintiff's evidentiary submission), Vol. I, Ex. 1, Oligee deposition, at 326-27.

[328] *See id.* at 327.

[329] *See id.*, Vol. III, Ex. 25, Hall deposition, at 31-32.

[330] *See id.*, Vol. I, Ex. 1, Oligee deposition, at 327-28.

office telephone communications.  As Jan Gill Wilkinson is not a party to this action, and there is no basis for holding QORE directly liability for her actions, the motion for summary judgment on Brian Cook's federal counterclaim will be granted.

## B.     State-law Counterclaim — Invasion of Privacy

It is generally accepted under Alabama law that the tort of invasion of the right to privacy actually consists of four distinct types of wrongs:  (1) "the intrusion upon the plaintiff's physical solitude or seclusion"; (2) "publicity which violates the ordinary decencies"; (3) "putting the plaintiff in a false, but necessarily defamatory, position in the public eye"; and, (4) "the appropriation of some element of the plaintiff's personality for a commercial use."  *Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705, 708 (Ala. 1983) (citing *Norris v. Moskin Stores, Inc.*, 132 So. 2d 321 (Ala. 1961) (other citation omitted)).  *See generally* Michael L. Roberts & Gregory S. Cusimano, *Alabama Tort Law* § 22.02 (4th ed. 2004).  Here, the counterclaimants base their causes of action on the first and third categories of wrongful conduct.

With regard to the first species of the privacy tort, the Supreme Court of Alabama has adopted the following definition provided in § 652B, *Restatement (Second) of Torts* (1977):

One who intentionally intrudes physically or otherwise, upon the

135

solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*See Phillips*, 435 So. 2d at 706, 709.  Comment b to this section of the Restatement explains, in part, that the type of invasion at issue "may be by physical intrusion into a place in which the plaintiff has secluded himself," or "by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs."  *Restatement (Second) of Torts*, § 652B cmt. b (1977).  Examples of such intrusions include looking into a person's bedroom with a telescopic lens, tapping a person's telephone in order to listen to his conversations, opening a person's private and personal mail, searching the person's safe or wallet, or examining his private bank account.  *See id.*  A key distinction of this privacy tort is that liability is triggered by the intrusion itself.  In other words, the tort is not dependent on whether any information is obtained by way of the intrusion, or whether there is any subsequent communication of the information.  *See Phillips*, 435 So. 2d at 709 (holding that acquisition of information from the plaintiff is not requisite element of a § 652B cause of action, nor is "publication" or "communication" of that information a necessary element).

With regard to the third species of the privacy tort ("false light"), the Supreme Court of Alabama has applied the following definition provided in § 652E,

136

*Restatement (Second) of Torts* (1977):

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a)  the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b)  the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*See Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993).   Here, the term "publicity" means that a "matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Swanson v. Civil Air Patrol*, 37 F. Supp. 2d 1312, 1331-32 (M.D. Ala. 1998) (observing that the definition for the term "publicity," provided in comment to § 652D of *Restatement (Second) of Torts*, applies with equal force to § 652E).   Moreover, because a matter must be disclosed in a "false light," it is essential that "the matter published concerning the plaintiff is not true." *Restatement (Second) of Torts*, § 652E cmt. a (1977).

### 1.    Brian Cook

The  evidentiary  basis  of  Cook's  counterclaim  is  (again)  the  deposition

testimony of Mary Hall.[331]   Construing the evidence in the light most favorable to the party opposing summary judgment, Jan Gill Wilkinson eavesdropped on Brian Cook's telephone communications at the office by using an "intercom" button located on her telephone.   On one occasion, Wilkinson recorded Cook's conversation, and permitted Mary Hall to listen to the recording later.

The court will assume without deciding that Jan Gill Wilkinson unlawfully intruded upon the seclusion and solitude of Brian Cook.   However, that is of little consequence here because Wilkinson is not a party to this action.   Cook attempts to hold QORE liable for the actions of Wilkinson, on the basis that her actions were ratified by QORE's management.   For reasons discussed above, that argument is unavailing.   Summary judgment on the invasion of privacy claim asserted by Brian Cook will be granted.

## 2.    Bill Kennard

The evidentiary basis of Bill Kennard's counterclaim is that, shortly after leaving QORE, he called Mary Hall (his former secretary) at her residence, and she recorded their conversation without his knowledge or consent.   The next day, Hall brought the recording to work and, after listening to its contents with her co-workers, Jan Gill Wilkinson and Whitney Cox, she gave the tape to Regional Manager Mack

---

[331] *See* doc. no. 54 (Answer and Counterclaim), ¶ 11 at 17.

McCarley for his review.  QORE subsequently submitted a transcript of the recording

in opposition to defendants' motions for summary judgment.

### a.  Intrusion upon solitude or seclusion

There is no basis for liability under this category of the privacy tort.  As

explained in *Restatement (Second) of Torts*, § 652B cmt. c (1977):  "The defendant

is subject to liability under the rule stated in this Section only when he has intruded

into a private place, or has otherwise invaded a private seclusion that the plaintiff has

thrown about his persons or affairs."  *See also Key v. Compass Bank, Inc.*, 826 So. 2d

159, 164 (Ala. Civ. App. 2001) (favorably quoting same passage from cmt. c to §

652B).    The  Restatements  provide  two  illustrations  in  the  context  of

telecommunications.  In the first example, an intrusion into seclusion may occur

where a private detective, seeking evidence for use in a lawsuit, rents a room in a

house adjoining the subject, taps the subject's telephone wires, and installs a

recording device to record the subject's conversations.  *See Restatement (Second) of

Torts*, § 652B cmt. b, Illustration 3.  Intrusion into seclusion also may occur where

a professional photographer, seeking to promote his business, telephones the subject,

a person of social prominence, every day for a month, at meal times, late at night, and

at other inconvenient times, and the photographer ignores the subject's requests to

desist.  *See id.* at Illustration 5.

Of course, neither situation is remotely similar to what transpired between Mary Hall and Bill Kennard.  Kennard voluntarily placed a telephone call to Mary Hall at her residence.  He wished to communicate information to her.  There is no evidence that he spoke on any matters against his will.  On the basis of these facts, the court cannot possibly conclude that Bill Kennard intended to keep himself and his thoughts cloaked from Mary Hall's "intrusion."

Of course, Mary Hall went on to (i) record the conversation between herself and Bill Kennard, and (ii) disclose the contents of the recording to her co-workers and QORE's management.  While these acts may be relevant to other species of privacy torts, they are not relevant to an invasion of seclusion cause of action.  As discussed earlier, a key distinction of this privacy tort is that it is the intrusion itself that triggers liability.  An invasion upon seclusion cause of action is not predicated on the acquisition or communication of information.  *See Phillips*, 435 So. 2d at 709.  *See also Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) (the plaintiff could not assert an invasion upon seclusion cause of action where he was a willing party to a telephone conversation that was recorded without his knowledge or consent); *Harman v. Gist*, 2003 WL 22053591, at *7 (N.D. Ill. Sept. 2, 2003) (the plaintiff could not assert an invasion of seclusion cause of action where the defendant merely recorded a phone message that the plaintiff had voluntarily left for her).  Therefore,

140

the motion for summary judgment on this aspect of the invasion of privacy claim will be granted.

### b. False light

Generally speaking, this species of the privacy tort prohibits giving "publicity" to information concerning an individual that places the individual in a "false light" to others. Whether the information relates to the individual's private life is immaterial. Rather, the falsity of the information is the critical element. As explained in *Restatement (Second) of Torts*, § 652E cmt. a (1977): "The form of invasion of privacy covered by the rule stated in this Section does not depend upon making public any facts concerning the private life of the individual. On the contrary, it is essential to the rule stated in this Section that the matter published concerning the plaintiff is not true."

Mary Hall recorded her conversation with Bill Kennard, and she disclosed the recording to QORE's management. QORE's management, in turn, has submitted a transcript of the recording in response to defendants' motions for summary judgment. While that fact may be disconcerting to Bill Kennard, he fails to articulate how the recorded statements he made to Mary Hall, or her responses, were in any way untruthful. The motion for summary judgment on the "false light" component of Bill Kennard's invasion of privacy claim will be granted.

**C.      State-law Counterclaim — Tortious Interference with Business Relationships**

As discussed in Part III(C) of this opinion, a plaintiff must prove the following elements to recover on a tortious interference claim under Alabama law:  (1) the existence of a contractual or business relationship; (2) defendant's knowledge of such relationship; (3) intentional interference by defendant with the relationship; and (4) damages to plaintiff as a result of defendant's interference.

Brian Cook asserts that QORE (through its employees) secretly recorded his telephone conversations, and used the contents of the recordings to "intentionally interfere with [his] relationships with his customers."[332]  Cook does not cite, and the court could not locate, any evidence to support the contention that there was intentional interference.  Summary judgment will be granted on the tortious interference claim asserted by Brian Cook.

Bill Kennard also asserts that that QORE (through its employees) secretly recorded his telephone conversations, and used the contents of the recordings to "intentionally interfere with [his] relationships with his customers."[333]  Kennard does not cite, and the court could not locate, any evidence to support the contention that there was intentional interference.  Summary judgment will be granted on the tortious

---

[332] Doc. no. 54 (Answer and Counterclaim), ¶ 14 at 18.

[333] Doc. no. 52 (Answer and Counterclaim), ¶ 14 at 18.

interference claim asserted by Bill Kennard.

## V.  CONCLUSION

The number of claims that survive summary judgment are far outnumbered by those that do not.  For the sake of simplicity, and to assist the parties' preparation for trial, the court will identify three categories of issues that remain for the court's consideration:  (1) the issues on which summary judgment is denied; (2) the issues on which motions for summary judgment were not filed, and (3) the issues on which the court will reserve judgment, for reasons explained in the text of this opinion.

With regard to the first category of claims, summary judgment is denied with regard to the following issues:

(1)    Did Brian Cook breach his fiduciary duty when he failed to advise QORE's upper management that, on August 15, 2003, he had received a notice of resignation from Bill Kennard?

(2)    Did Brian Cook conspire with Bill Kennard and Diana Lack to keep that August 15 notice of resignation a secret from QORE's upper management?

(3)    Did Bill Kennard breach his fiduciary duty when he offered employment to Diana Lack on August 12 or 13, 2003, on behalf of Civil Solutions?

(4)    Did Bill Kennard conspire with Jeff Mullins and Richard Grace to make that offer of employment to Diana Lack?

(5)    Did Diana Lack download the client list and the job list from the QORE Information System on August 12, 2003, and if so, did that

result in, or lead to, a wrongful taking, an illegal assumption of ownership, or a wrongful detention or interference with QORE's property?

(6)     Brian Cook, Bill Kennard, and Diana Lack returned the following items in response to a formal discovery request: a toolbox; the resistivity meter manual; the Health and Safety Manual; and, QORE's Statement of Qualification prepared for O&S Holdings. Was there a wrongful taking, an illegal assumption of ownership, or a wrongful detention or interference with QORE's property, with regard to each of those items?

No motions for summary judgment were filed with regard to the following issues and, therefore, each is for trial:

(7)     Did Bill Kennard breach his fiduciary duty when he allegedly performed substandard work on the following projects: the Broglan Branch design; the Gillespie Road project; the Western Area Outfall project; and, the Meridian Street design?

(8)     Did QORE, through its employees, violate Diana Lack's right to privacy under Alabama law, and tortiously interfere with her business relationships?

The court reserves judgment on the following issues, pending consideration of additional briefs:

(9)     Assuming that Diana Lack downloaded the client list and the job list from the QORE Information System on August 12, 2003, may QORE bring a duty of loyalty cause of action against her on the basis of that evidence?

(10)    It is undisputed that Diana Lack received a written offer of employment from Civil Solutions on August 12 or 13, 2003. On the basis of that evidence, may QORE bring a cause of action for

144

tortious interference with contractual and business relations, against Bill Kennard, Jeff Mullins, and Richard Grace?

(11)   What liability could the individual defendants have avoided by organizing Geo Solutions, LLC on September 17, 2003?

(12)   Assuming that the individual defendants in this case (with the exception of Diana Lack) exercised complete control of Jeff W. Mullins, P.C., Grace Group, P.C., W. Kennard, Inc., and Brian Cook, Inc., respectively, how was the control misused by each individual defendant, and how did the misuse of the control proximately cause a harm or unjust loss?

(13)   In light of partial summary judgment being granted on the underlying claims asserted in this action, which components of the $1.7 million in total damages asserted by QORE are now moot?

An appropriate order setting forth the briefing schedule will be entered on a later date.

Finally, summary judgment is due to be, and will be, granted on all other aspects of the claims and counterclaims asserted in this lawsuit.

DONE this 2nd day of March, 2006.

_____
United States District Judge

145